The NATIONAL NUTRITIONAL FOODS ASSOCIATION, the National Association of Pharmaceutical Manufacturers and Solgar Co., Inc., Petitioners,

v.

Donald KENNEDY, Commissioner of Food and Drugs, and United States Department of Health, Education & Welfare, Food and Drug Administration, Respondents.

Miles H. ROBINSON, pro se, Petitioner,

v.

Donald KENNEDY, Commissioner of Food and Drugs, and United States Department of Health, Education & Welfare, Food and Drug Administration, Respondents.

Nos. 604 and 605, Dockets 77–4097 and 77–4104.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1977.

Decided Feb. 16, 1978.

19. *Frasca v. Prudential Grace Lines, Inc., supra,* 394 F.Supp. at 1102 (granting judgment n.o.v.).

378

Milton A. Bass, New York City (Jacob
Lauffer, and Bass, Ullman & Lustigman,
New York City, of counsel), for petitioners,
The National Nutritional Foods Association,

The National Association of Pharmaceutical Manufacturers and Solgar Co., Inc.

Miles H. Robinson, M. D., pro se.

Charles R. McConachie, Chief, Consumer Affairs Section, U. S. Dept. of Justice, Washington, D. C. and Jess H. Stribling, Food and Drug Administration, Rockville, Md. (John H. Shenefield, Asst. Atty. Gen., Antitrust Div., Dept. of Justice, Washington, D. C., and Stephen H. McNamara, Acting Chief Counsel, Food and Drug Administration, Rockville, Md., of counsel), for respondents.

Before FRIENDLY, SMITH and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This is the latest but, unfortunately, probably not the last chapter in the bitter battle between the Food and Drug Administration (FDA) and manufacturers and vendors of pills and liquids containing vitamins and minerals and citizens allied with the latter. While the manufacturers and vendors have obvious private interests as well, the battle reflects what appears to be a sincere sentiment on the part of many citizens that daily ingestion of a substantial quantity and variety of vitamins and minerals in the form of pills or liquids, in addition to those furnished by ordinary diet, is needed for good health, especially because of the increasing consumption of "the modern food fads—sweet drinks, junk foods, heavy sugar diets" and "wheat germ-free bread and nutritionally inadequate breakfast foods," 121 Cong.Rec. S. 21856 (daily ed. Dec. 11, 1975) (Sen. Proxmire), and the FDA's equally sincere belief that the promotion of what, on a previous review, this court called a "dazzling array" of recommended daily dosages and combinations, *National Nutritional Foods Ass'n v. Food & Drug Administration*, 504 F.2d 761, 776 (2 Cir. 1974), *cert. denied*, 420 U.S. 946, 95 S.Ct.

1326, 43 L.Ed.2d 424 (1975), is causing consumers to waste millions of dollars annually in the purchase of vitamin and mineral preparations which they either do not need at all or do not need in the potencies or combinations that are being bought. The battle began nearly a generation ago with the FDA's publication of a Proposal to Revise Regulations in the Federal Register of June 20, 1962, 27 F.R. 5815; the proposal included the establishment of standards of identity for "food for special dietary uses" and revised label standards for them. Because the FDA's establishment of a standard of identity under § 401[1] and its prescription of labels for foods for special dietary use under § 403(j) are among the few instances on the statute books where an evidentiary hearing is required for rulemaking, § 701(e), over twenty-two months were devoted to such a hearing, which developed a transcript of 32,405 pages and hundreds of exhibits. The Commissioner published final regulations on August 2, 1973, 38 F.R. 20708–18, 20730–40.

Fifteen petitions to review were filed; their disposition by this court required a 47-page opinion, 504 F.2d 761 (1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), familiarity with which is assumed. Although "broadly sustaining the regulations," 504 F.2d at 786, we stayed them and remanded the case for the FDA to carry out a number of directives. One was that it should modify § 80.1(b)(4) of the Standard of Identity regulations to include increases in upper limits of potency as well as new combinations of vitamins and minerals and to entertain applications thereunder before the new regulations became effective, 504 F.2d at 783–86. We invalidated § 125.1(c) of the Label Regulations, which forbade the inclusion in "general purpose foods or dietary supplements of vitamins and minerals" of two vitamins[2] and six minerals,[3] which the FDA had recognized to

---

1. All section references to the Federal Food, Drug and Cosmetic Act in this opinion are to the Act itself and not to 21 U.S.C. §§ 301, *et seq.*

2. To wit, vitamin K and choline.

3. To wit, chlorine, fluorine, manganese, potassium, sodium, and sulfur. See 38 F.R. 20717 (§ 125.1(c)). Since then, the minerals chromi-

be essential to human nutrition but for which no U.S. RDA's (recommended daily allowances) had been established, 504 F.2d at 786–787,[4] and § 125.1(h) of the Label Regulations declaring that preparations containing more than the upper limits of the U.S. RDA per serving were "drugs." 504 F.2d at 788–89. Finding that the cross-examination of Dr. William Sebrell, the most knowledgeable witness testifying on the preparation of the 1968 National Academy of Science Recommended Dietary Allowances whence the U.S. RDA's were drawn, by Dr. Miles Robinson, then representing the National Health Federation and now a pro se petitioner here, had been improperly restricted by the hearing examiner, we instructed the FDA "to reopen the record for the limited purpose of permitting reasonable cross-examination of Dr. Sebrell (or, if he is not available, some other qualified member of the [Food and Nutrition] Board [of the National Academy of Sciences-National Research Council] by Dr. Robinson or counsel of some other similarly interested Participants," 504 F.2d at 792–99. We faulted § 125.2(b)(2) of the Label Regulations as unsupported by substantial evidence insofar as it prohibited claims that a balanced diet of ordinary foods would not supply an amount of iron adequate for women of childbearing age and for children; as to this we directed that the FDA either supply further evidence to justify this prohibition or "insert a proper qualification" in the regulation, 504 F.2d at 802. Finally, we directed that fresh fruits and vegetables be exempted from the regulations, 504 F.2d at 806–07.

After the Supreme Court had denied petitions for certiorari by those who had been petitioners here, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), the Commissioner published in the Federal Register of May 28, 1975, 40 F.R. 23244–50, a paper bearing the three-headed title "Opportunity for Filing Applications for Additional Formulations of Dietary Supplements of Vitamins and Minerals; Preliminary Notice of Reopening of Hearing; Tentative Amendments to Final Orders." Under the first heading the FDA prescribed how and where applications for additional approved formulations should be made; it also advised that it would not be necessary to seek approval of products having a higher potency than the U.S. RDA's so long as the products consisted of a single vitamin or mineral since the Commissioner intended to amend the regulations to permit this. Under the second heading the Commissioner proposed to tender on the reopened hearing, in lieu of Dr. Sebrell who was no longer a member of the Food and Nutrition Board, his successor as Chairman, Dr. Alfred E. Harper. The cross-examination was to include (1) the methodology employed in development of the recommended dietary allowances by the Board and the scientific foundation upon which these allowances are based, (2) the scientific appropriateness of the Food and Drug Administration's use of the Board's recommended dietary allowances, and (3) possible biases or conflicts of interests on the part of the Board, as well as other relevant subjects, and the FDA intended to open cross-examination not only to Dr. Robinson but "to as many participants reflecting as many points of view as is reasonably possible." 40 F.R. 23245. Under the third heading the Commissioner proposed a number of amendments to the regulations, most of which were intended to implement this court's order.

The reopened hearing before an Administrative Law Judge (ALJ) occurred in November, 1975, lasted six days and produced an additional 1119 pages of transcript. On February 20, 1976, the ALJ entered a report and recommended order finding that:

(1) Alleged biases and/or conflicts of interest of the witness or other members of the Food and Nutrition Board have not been established in any degree which might reasonably be interpreted as af-

---

um, molybdenum, nickel, selenium, silicon, tin, and vanadium have been added to the list while sulfur has been removed from it. See 21 C.F.R. §§ 105.3(c), 105.85(d)(4).

4. We took a similar view with respect to any nutrients recognized as essential in human nutrition but not mentioned anywhere in the regulations, see 504 F.2d at 787, n. 31.

fecting the judgment of the witness or other members of the Board in determining the RDA's.

(2) Although the Board determined the RDA's as a guide to sound nutrition for a healthy population, and not as standards for regulatory purposes, there is nothing inconsistent or unsound in using the RDA's as a basis for regulatory determinations as to labeling and nutritional content requirements, and

(3) Information adduced through detailed cross-examination into the scientific basis and methodology utilized by the Board in determining the RDA's does not require adoption of regulations differing from those published.

Exceptions to this were filed.

Meanwhile the scene of action had shifted. On April 22, 1976, the President signed Public Law 94–278, extensively amending the Food, Drug and Cosmetic Act. Section 501(a) added to the Act § 411, which we reproduce in the margin.[5] Broadly speaking subsection (a) put an end to the FDA's efforts to limit the potency of any vitamin

---

**5.** (a)(1) Except as provided in paragraph (2)—

(A) the Secretary may not establish, under section 201(n), 401, or 403, maximum limits on the potency of any synthetic or natural vitamin or mineral within a food to which this section applies;

(B) the Secretary may not classify any natural or synthetic vitamin or mineral (or combination thereof) as a drug solely because it exceeds the level of potency which the Secretary determines is nutritionally rational or useful;

(C) the Secretary may not limit, under section 201(n), 401, or 403, the combination or number of any synthetic or natural—

(i) vitamin,

(ii) mineral, or

(iii) other ingredient of food,

within a food to which this section applies.

(2) Paragraph (1) shall not apply in the case of a vitamin, mineral, other ingredient of food, or food, which is represented for use by individuals in the treatment or management of specific diseases or disorders, by children, or by pregnant or lactating women. For purposes of this subparagraph, the term 'children' means individuals who are under the age of twelve years.

(b)(1) A food to which this section applies shall not be deemed under section 403 to be misbranded solely because its label bears, in accordance with section 403(i)(2), all the ingredients in the food or its advertising contains references to ingredients in the food which are not vitamins or minerals.

(2)(A) The labeling for any food to which this section applies may not list its ingredients which are not vitamins or minerals (i) except as a part of a list of all the ingredients of such food, and (ii) unless such ingredients are listed in accordance with applicable regulations under section 403. To the extent that compliance with clause (i) of this subparagraph is impracticable or results in deception or unfair competition, exemptions shall be established by regulations promulgated by the Secretary.

(B) Notwithstanding the provisions of subparagraph (A), the labeling and advertising for any food to which this section applies may not give prominence to or emphasize ingredients which are not—

(i) vitamins,

(ii) minerals, or

(iii) represented as a source of vitamins or minerals.

(c)(1) For purposes of this section, the term 'food to which this section applies' means a food for humans which is a food for special dietary use—

(A) which is or contains any natural or synthetic vitamin or mineral, and

(B) which—

(i) is intended for ingestion in tablet, capsule, or liquid form, or

(ii) if not intended for ingestion in such a form, does not simulate and is not represented as conventional food and is not represented for use as a sole item of a meal or of the diet.

(2) For purposes of paragraph (1)(B)(i), a food shall be considered as intended for ingestion in liquid form only if it is formulated in a fluid carrier and it is intended for ingestion in daily quantities measured in drops or similar small units of measure.

(3) For purposes of paragraph (1) and of section 403(j) insofar as that section is applicable to food to which this section applies, the term 'special dietary use' as applied to food used by man means a particular use for which a food purports or is represented to be used, including but not limited to the following:

(A) Supplying a special dietary need that exists by reason of a physical, physiological, pathological, or other condition, including but not limited to the condition of disease, convalescence, pregnancy, lactation, infancy, allergic hypersensitivity to food, underweight, overweight, or the need to control the intake of sodium.

(B) Supplying a vitamin, mineral, or other ingredient for use by man to supplement his diet by increasing the total dietary intake.

(C) Supplying a special dietary need by reason of being a food for use as the sole item of the diet.

or mineral included in "a food for special dietary use," as defined in subsection (c), or the number or combination of vitamins, minerals or other food ingredients included therein except when the vitamin, mineral, other ingredient of food, or food, . . . is represented for use by (1) individuals in the treatment or management of specific diseases or disorders, (2) children under the age of twelve, or (3) pregnant or lactating women. The limitation of the FDA's authority with respect to labelling was much less severe; the main thrust was to forbid FDA regulations that would wholly prohibit inclusion in labels of ingredients which were not vitamins or minerals. Section 501(b), which is of special importance to our decision, provided:

> The Secretary of Health, Education, and Welfare shall amend any regulation promulgated under the Federal Food, Drug, and Cosmetic Act which is inconsistent with section 411 of such Act (as added by subsection (a)) and such amendments shall be promulgated in accordance with section 553 of title 5, United States Code.

Without engaging in any further proceeding, the Commissioner published final regulations in the Federal Register of October 19, 1976, 41 F.R. 46156–76. The Commissioner believed that almost all the applications for new formulations had been mooted by the 1976 amendment. He approved a new combination of vitamins A, D and C with provision for optional inclusion of vitamin E and/or iron, as a dietary supplement for infants and young children, denied an application for a preparation containing a higher level of vitamin $B_6$ for pregnant and lactating women, and determined to treat as drugs multinutrient supplements for women taking oral contraceptives which contained estrogen. He overruled the exceptions to the ALJ's report concerning the examination of Dr. Harper, to other evidentiary rulings at the reopened hearing, and to FDA's continued reliance on the NAS–RDA's. He passed upon and

largely rejected the exceptions to the amendments proposed in the notice of May 28, 1975, noting that many exceptions were mooted as a result of the 1976 legislation. The Commissioner's technique was essentially to readopt the 1973 regulations with reorganization "to improve clarity," modifications designed to meet our directions, addition of a section classifying dietary supplements not "generally recognized as safe" as "food additives," and a further modification, § 80.1(e), "which provides that products subject to the new vitamin/mineral legislation are not subject to the maximum potency limits and the limits on inclusion of ingredients otherwise imposed on dietary supplements by §§ 80.1 and 125.2(b)(5)." 41 F.R. 46170.

This action by the Commissioner evoked an "urgent petition" dated November 30, 1976, by the attorneys for National Nutritional Foods Association, National Association of Pharmaceutical Manufacturers and Solgar Co., Inc., who constitute one group of petitioners on this second round of review. While the petition advised that the details of the new regulations were being evaluated its emphasis was directed at the FDA's procedure in promulgating the final regulations without having "requested from the public any input as to what changes would be necessary in the regulations in light of the newly enacted vitamin and mineral legislation." The petition asked the Commissioner to "withdraw the final order published in Federal Register of October 19, 1976 and substitute therefor a republished proposed order which gives the public the full right to submit comments and objections in accordance with the requirements of § 701(e) of the Federal Food, Drug and Cosmetic Act." A prompt ruling was requested.

The Commissioner made no answer for four and a half months.[6] In the Federal Register for April 19, 1977, 42 F.R. 20292–96, he published his response to the petition

---

**6.** Meanwhile the regulations had been recodified into 21 C.F.R. Part 105, with § 105.3 containing definitions, §§ 105.77 and .79 containing labelling requirements and § 105.85 the standard of identity.

of November 30, 1976, as well as to a letter dated November 12, 1976, in which Dr. Robinson expressed disagreement with the FDA's ruling that the cross-examination of Dr. Harper had not impugned the U.S. RDA's. On the procedural issue, the Commissioner now took note of § 501(b) of the 1976 legislation, as he had not previously done. He concluded that he was nevertheless empowered to issue final regulations "without prior notice of proposed rulemaking and public procedure" because of the provision in 5 U.S.C. § 553(b) that "Except when notice of hearing is required by statute," the requirement of publishing notice of proposed rulemaking does not apply

> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

The Commissioner reviewed the provisions of the final regulation "that were prompted by the new legislation," and concluded in each case that public rulemaking procedures would be "impracticable" and "unnecessary" because he was simply bowing to the will of the legislature.[7] The Commissioner further rejected the contention that he should have followed the "hearing on the record" procedure described in § 701(e). These petitions for review followed.[8]

### Discussion

#### (1) The procedural questions.

██ We conclude that the Commissioner committed procedural error and that this requires a further remand. We reach this conclusion with regret in light of the fifteen and a half years that have elapsed since the FDA began its efforts to achieve better control of the identity and labelling of vitamin and mineral preparations. However, we are convinced that in failing to give notice of proposed rulemaking and to accord an opportunity for public participation in the process, as provided in 5 U.S.C. § 553(b) and (c), the Commissioner violated the mandate of Congress.

We begin our discussion with Professor Kenneth Culp Davis' oft-quoted statement:

> The procedure of administrative rule making is one of the greatest inventions of modern government.[9]

In view of the important political interests served by public participation in rulemaking, it would be arguable that even in the absence of a specific direction, this unusual situation where Congress effected a profound alteration in an agency's powers while rulemaking was in progress[10] would have called for a new issuance of proposed rules and public participation in rulemaking, as the Commissioner had accorded on his own motion after he had redrafted the 1973 regulations in light of our remand. We need not address that question, however, since Congress did give explicit directions in § 501(b) quoted above.

It is true that, if read literally, § 501(b) applies only to regulations amending "any regulation promulgated" under the Act which is inconsistent with the new § 411 and the standard of identity regulations for vitamin and mineral food were not regulations amending a regulation that had been promulgated but rather regulations that were awaiting promulgation, since the previous opinion of this court stayed the regulations and remanded them to the FDA.

---

7. The Commissioner altered a provision of the regulations that would have required a vitamin and mineral preparation "newly authorized by Congress" to "bear a term that is accurately descriptive of its vitamin and/or mineral composition" so as to say simply that such product shall bear as part of its name "an appropriately descriptive term." The Commissioner left intact a provision requiring that such a product "accurately identify the group for which it is offered," finding the requirement "obviously reasonable." See 42 F.R. 20295.

8. By order published July 8, 1977 the effective date of the regulation was postponed from January 1, 1978 to July 1, 1979, 42 F.R. 35152.

9. *Administrative Law Treatise* § 6.15 at 283 (1970 supp.).

10. Description of the changes required 8 pages in the House Conference Report, H.R.Rep. No. 94–1005, 94th Cong., 2d Sess. (1976); U.S.Code Cong. & Admin.News 1976, p. 709.

However, the Commissioner properly did not attempt to read § 501(b) so literally;[11] clearly what Congress had in mind in enacting § 501(b) was the Commissioner's much debated proposed vitamin and mineral regulations, which Congress was aiming to restrict. Rather the Commissioner sought to justify his decision not to engage in public rulemaking on the basis, sound enough as an abstract proposition, that when Congress referred to 5 U.S.C. § 553(b), it included the exceptions therein contained. In effect the Commissioner reads § 501(b) as meaning only that *if* he decided that further procedures were needed, these could be of the notice and comment type prescribed by 5 U.S.C. § 553(b) and (c) rather than the trial type procedure prescribed by § 701(e) of the Food, Drug and Cosmetic Act in cases where it applies.

· One answer that might be made to the Commissioner's reliance on the exceptions in 5 U.S.C. § 553(b)(B) is that the Commissioner did not include in the October 19, 1976 rules the statement required in the parenthetical clause and that it was too late for him to do so on a petition for reconsideration.[12] While such a denial of a *locus poenitentiae* might seem unduly literalistic, cf. *Nader v. Sawhill*, 514 F.2d 1064, 1068

11. In any event the proposed labelling regulations constituted an amendment of a 1955 regulation, 21 C.F.R. part 25. See 504 F.2d at 767.

12. The Commissioner argues that he presented an adequate statement of reasons when he announced in the October 19, 1976 Federal Register:

Furthermore, recognizing the will of Congress, the Commissioner has moved expeditiously also to amend the regulations so that they no longer purport to limit the inclusion of ingredients or maximum potency of vitamins or minerals subject to the new legislation.

41 F.R. 46170. By no stretch of the imagination could this statement be said to articulate reasons to forego the notice and comment procedures of 5 U.S.C. § 553. Rather, it merely describes what the Commissioner had done.

13. Although not faced with the precise problem here under discussion, a number of courts have insisted that agencies preface regulations issued under the good cause exception of § 553(b)(B) with the requisite "finding and a brief statement of reasons therefor," striking down regulations where agencies had made

(TECA 1975), we are not sure that is necessarily so. Congress could well have wished to require an agency to address its mind to whether a case fell within the exceptions before it committed itself to final regulations, not after it had done so without complying with 5 U.S.C. § 553(b) and (c) procedures and thereby created a need for self-justification.[13] At the very least, justifications after the event are somewhat suspect. See *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *National Nutritional Foods Ass'n, supra*, 504 F.2d at 789. However, we need not pass on this since the Commissioner would not have been warranted in dispensing with public rulemaking even if he had included in the October 19, 1976 regulations the findings of impracticability and lack of necessity which he made on April 19, 1977.

■ The legislative history of the Administrative Procedure Act demonstrates that Congress intended the exceptions in § 553(b)(B) to be narrow ones. The Senate Report, No. 752, 79th Cong. 1st Sess. (1945), reprinted in the Legislative History of the Act at 200, stated:

considerably more serious attempts at a statement of reasons than the Commissioner initially made here. See *Kelly v. United States Dep't of Interior*, 339 F.Supp. 1095, 1101 (E.D.Cal. 1972); *Akron, Canton & Youngstown R.R. v. United States*, 370 F.Supp. 1231, 1241 (D.Md. 1974); *City of New York v. Diamond*, 379 F.Supp. 503, 515–17 (S.D.N.Y.1974). *Nader v. Sawhill, supra*, 514 F.2d at 1068, is not a significant departure from this line of cases. Good cause was provided there by the Cost of Living Council's concern that announcing an increase in the price of oil 30 days before its effectiveness would cause producers to withhold oil from the market until they could take advantage of the increase, a "calamitous" circumstance in light of the then-pending Arab oil embargo. Indeed, the same court later cited *Nader v. Sawhill* as one of a line of cases in which it took "judicial notice of the emergency nature of the legislation and accompanying regulations" in order to meet the requirements of 5 U.S.C. § 553. *Tasty Baking Co. v. Cost of Living Council*, 529 F.2d 1005, 1014–15 (TECA 1975).

The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure.[14]

See also American Iron and Steel Institute v. EPA, 568 F.2d 284 at 292 (3 Cir. 1977) (citing legislative history to support proposition that 5 U.S.C. § 553(b)(B) exceptions are to be narrowly construed).

The final regulations do not meet this strict standard. The exception for impracticability is plainly unavailable. "The due and required execution of the functions" of the FDA would hardly have been "unavoidably prevented" by further public rulemaking in the fall of 1976 with respect to regulations which already were 14 years in the making and which the agency now has stayed on its own motion until July 1, 1979. Likewise, the Commissioner cannot resort to the exception invoking the "public interest" since requiring public rulemaking proceedings would not have prevented the FDA from operating or otherwise have harmed the public weal. In fact the Commissioner relies much more heavily on the claim that public participation was unnecessary; he argues that since Congress had spoken, there was nothing more for the

public to say and the agency's duty was simply to excise portions of the proposed regulations that Congress had placed beyond its power. But the agency's task went beyond a mere wielding of scissors. While the 1976 legislation withdrew old powers, it also imposed new duties, notably with respect to labelling, see § 411(b)(2). Indeed in the preamble to the October 19, 1976 regulations, the Commissioner had noted that the new legislation "requires extensive labelling revisions even in the absence of the new FDA regulations." 41 F.R. 46170. In view of the history of the administrative proceedings and the legislative struggle, there was no basis for the Commissioner's believing that the public would not be "particularly interested" in his next move; if he ever entertained such a belief, the "urgent petition" of November 30, 1976 must have disabused him of it. Cf. Texaco, Inc. v. FPC, 412 F.2d 740, 743 (3 Cir. 1969). Moreover, the problem created by the 1976 amendment went deeper than the Commissioner would have it. His promulgation of a standard of identity for vitamin and mineral preparations had rested primarily not on considerations of safety but on the need to lessen confusion among consumers. As had been said in the Commissioner's finding 22, which we cited in our opinion, 504 F.2d at 776:

> The establishment of qualitative and quantitative limits on the composition of dietary supplements will reduce consumer confusion concerning choice of dietary supplements by ensuring a basically rational formula for all products.

By the 1976 legislation Congress pronounced that it was not concerned about this for the public in general or, at least, that it considered the costs incident to reducing consumer confusion for the entire public by the FDA's proposed standard of identity to be too high in relation to the benefits to be achieved. Cf. 504 F.2d at 782–83. While Congress permitted the agency to impose a standard of identity in

---

**14.** The House Report, H.R.Rep. No. 1980, 79th Cong., 2d Sess. (1946), Legislative History at 258, uses identical language.

the three instances cited in § 411(a)(2), it did not require this. Presumably it wished the agency to consider whether to impose a standard and, if so, what standard for the three permitted cases.[15] The record which we found to have furnished substantial evidence to support the standard of identity previously prescribed thus might not serve the same office with respect to the limited applications now permitted.[16] At least those who did not believe so were entitled to an opportunity to present their views, with the agency and other opposing interests, if unpersuaded, then having an opportunity to show why these were wrong. In short the FDA's task was not simply to grant an exemption from provisions in the proposed regulations which the 1976 legislation had rendered illegal but to promulgate regulations which it deemed suitable in the light of what Congress had done. Performance of so major a task did not come within the limited exceptions of 5 U.S.C. § 553(b)(B).

On the other hand the Commissioner properly rejected the petitioners' claim that further trial type procedures under § 701(e) were required. The 1976 statute specifically directed that further procedures should be of the sort prescribed by § 553 and not by § 556 of Title V. Congress, which must have been fully aware of the snail-like pace and the Gargantuan record which compliance with § 701(e) had entailed, had had enough, so far as these regulations were concerned. In bringing these proceedings to an end, the FDA was relieved of the need of engaging in the trial type proce-

dures that had been required when they began. We add that we do not think the agency is required to consider objections which could have been but were not previously raised, which were raised and overruled but were not appealed to this court, or which this court decided favorably to the agency, unless the objection takes on a significantly new aspect in light of the 1976 amendments.

Although we could end our opinion at this point, except for treating some of Dr. Robinson's claims, and we shall not deal with many of petitioners' objections (Brief, points IV–VII) that may disappear or be better answered by the Commissioner as a result of new rulemaking, our desire to assist in bringing these proceedings to a conclusion impels us to discuss a few additional points.

(2) *Petition of Dr. Robinson.*

■ We have carefully reviewed Dr. Robinson's many procedural and substantive objections to the cross-examination of Dr. Harper and to the Commissioner's conclusion that the U.S. RDA's had been properly prepared and furnished a sufficient basis for the potency limits in the standard of identity. We have concluded that these would be without merit, largely for the reasons stated in the Commissioner's careful analysis in October, 1976, 41 F.R. 46157–65, if the issue had remained the same as it was at the time of our remand and of Dr. Harper's cross-examination. The agency

---

**15.** Senator Proxmire, one of the sponsors of the 1976 legislation, said during debate on the bill that the exemption of children and pregnant or lactating women from the restrictions of the statute

does not mean that the FDA can merely, once again, arbitrarily set limits on vitamin RDA's for pregnant or lactating women or children and proclaim that an otherwise safe vitamin or mineral is a drug because it is 150 percent of the RDA or meets some other arbitrary standard. It is our view that under the recent appellate court decision the FDA would have to have some objective standard on which to base its limitations of vitamins or minerals for use by these groups.

121 Cong.Rec. S21856 (daily ed. Dec. 11, 1975). While it is unclear what "objective standard" Senator Proxmire had in mind, it is plain that he expected thorough reexamination of existing proposals, and not a mere mechanical excision.

**16.** In saying this we are aware that the 1973 regulations had permitted different potencies for children under 4 years of age and for pregnant or lactating women than for adults and children 4 or more years of age, see 504 F.2d at 769. As we understand it, the effect of the exemption, now § 105.85(e), is that the potency columns headed "Adults and children 4 or more years of age" have no application to adults but apply only to children more than four and less than twelve, if the other conditions of exemption are met.

thus is not required to replough ground which has been so thoroughly tilled.[17] However, as indicated in the previous section of this opinion, the issue under the 1976 legislation is the possibly different one of the propriety of using the U.S. RDA's as a basis for a standard of identity for the three classes of consumers there specified. The rulemaking should therefore permit notice and comment on the issue whether, assuming that the U.S. RDA's were proper for the broad purpose for which they were used in the 1973 regulations, they are suitable for the special purposes now permitted.

(3) *Retention of minimum potency requirements.*

■ Petitioners contend that the Commissioner erred in retaining the minimum potency requirements for dietary supplements. Both the Commissioner and the petitioners cite the statement in the conference report on the 1976 legislation that

[N]ew section 411(a)(1)(A) of the Act prohibits the Secretary from using his existing authority under sections 201(n) or 403 of the Act (relating to misbranding) or under section 401 of the Act (relating to standards of identity) to impose maximum limits on the potency of safe vitamins and minerals contained in products subject to the conference substitute. This provision would not restrict the Secretary from prescribing minimum potency levels for vitamins or minerals in such products in order to prevent the addition of insignificant or useless amounts.

H.R.Rep. No. 94–1005, *supra* at 26; U.S. Code Cong. & Admin.News 1976, p. 749.

From this, the Commissioner argues that the new statute did not limit his authority to prescribe minimum potencies. Petitioners grant that the Commissioner has this authority, but contend that, in accordance with the mandate of the conference report, he exercised it on the basis that the minimum potencies were necessary to prevent addition of insignificant or useless amounts

of vitamins or minerals from being included in dietary supplements, 41 F.R. 46166, and that this differs from his original rationale, which was to prevent consumer confusion. To proceed under the new rationale, petitioners argue, the Commissioner must develop new evidentiary support.

We do not think the Commissioner promulgated the minimum potency requirements with the sole aim of avoidance of consumer confusion. He included in his original findings of fact statements such as:

12. Some dietary supplements contain so little of a named nutrient as to be insignificant in human nutrition. . . . There is a sound scientific basis for establishing quantitative minimums on the nutrient ingredients for dietary supplements since only substantial amounts of nutrients should be represented for purposes of dietary supplementation. . . .

13. Certain dietary supplements are objectionable because they must be taken in large numbers of units for the user to get the designated amounts of the nutrients involved. . . . In establishing a standard of identity for dietary supplements it is medically and pharmacologically sound to establish a standard of identity for dietary supplements on the basis of units suitable for and practical of consumption in one day.

38 F.R. 20734–35. See also 38 F.R. 2158 ("Establishing 50 percent as the lower permissible limit provides protection for the consumer from inadequate amounts of nutrients for supplementation purposes."). The fact that the new legislation may prevent the Commissioner from excluding from dietary supplements compounds he thinks worthless in no way undermined his authority, which Congress specifically preserved, to prescribe minimum potencies for vitamins and minerals. Nor do we think it inconsistent that the Commissioner has set one standard of significance for representations concerning nutrients in food which constitutes a portion of a meal, 21 C.F.R.

---

**17.** Specifically, we reject the attack on Doctor Harper as biased, the objections to the evidentiary rulings of the ALJ, and the general methodological challenges to the RDA's. The only further inquiry that we sanction here is the one delineated in text.

101.9(c)(7)(v), and another for determining permissible levels of nutrients in a dietary supplement. The very purpose of a dietary supplement is to provide a significant amount of such nutrients. We hold to our previous opinion that the limits the Commissioner has set are "clearly within the language and purpose of § 401." 504 F.2d at 774 n. 10.

(4) *Compliance with this court's remand.*

Petitioners complain that the Commissioner failed to comply with our directions on remand in five respects:

(a) *Inclusion of essential vitamins and minerals for which no U.S. RDA's have been established.*

■ Petitioners allege that the FDA has failed to comply with our direction, 504 F.2d at 786–87, to permit the inclusion of the vitamins and minerals recognized to be essential to human nutrition but for which no U.S. RDA's have been established. See notes 2 and 3 *supra.* The Commissioner answers that the final regulations do permit these elements to be included in "nonconforming" multinutrient dietary supplements [18] or in single ingredient vitamin or mineral preparations. With respect to the continued exclusion of these vitamins and minerals from multivitamin and/or multimineral preparations to which the original standard of identity applies, the Commissioner relies on a passage in his statement initiating the 1975 rulemaking, 40 F.R. 23246, that "there currently is no body of scientific evidence establishing that American diets are deficient in any" of these vitamins and minerals and thus "it would be wasteful and misleading to include them in standardized multicomponent dietary supplements consumed by individuals who wish to assure themselves that they consume the range of vitamins and/or minerals important for good nutrition." This is nothing more than we previously had before us and is hard to reconcile with the inarticulate premise that inclusion would have been permitted if U.S. RDA's had been established and with the permission to include these nutrients in preparations consisting of a single vitamin or single mineral for which U.S. RDA's have been prescribed. If there is evidence to support the Commissioner's conclusion, in the new world of the 1976 legislation, additional to what we previously found insufficient when the Commissioner had a broader power to prescribe a standard of identity, the Commissioner may adduce it in the further rulemaking; we have no desire to insist on the letter of our prior opinion if the Commissioner can produce evidence to justify his action.

(b) *Variances from the regulations.*

■ Petitioners criticize the Commissioner's compliance with our directions, 504 F.2d at 785, "that § 80.1(b)(4) be modified to permit upward revisions in the maxima for particular vitamins or minerals" in the light of scientific research and "that the criteria be broadened to conform to the standards of § 401." Petitioners requested the FDA to say that in ruling on applications for upward variances and added combinations, it would be guided by the factors mentioned by us, 504 F.2d at 785–86. The agency declined the latter request, as it properly could, and responded to our direction by saying only that it would allow variances only if a petitioner produced "data to show that such amendment will promote honesty and fair dealing in the interest of consumers," 41 F.R. 46171. See 21 C.F.R. 105.85(a)(5). The Commissioner says that this met our direction since it echoes the preamble to § 401 with respect to his authority to promulgate a standard of identity. This is a bit too facile. Our holding was that in light of the state of scientific information, the Commissioner had exceeded his mandate if he did not allow for modification of the regulations as knowledge advanced. The proponent of a change discharges his burden if he can show

18. We understand this to mean the products for which the Commissioner's authority to prescribe maximum potencies or permissible combinations of vitamins or minerals above the minimum potencies was withdrawn by the 1976 legislation; if so, the grant of this permission scarcely represents a response by the Commissioner to our direction.

that it will achieve the Commissioner's goals to the same extent as the existing regulations; he should not be required to show it will constitute an improvement.

### (c) *Proviso with respect to iron.*

■ In our prior opinion, 504 F.2d at 801–02, we approved the prohibition of label statements suggesting "[t]hat a balanced diet of ordinary foods cannot supply adequate amounts of nutrients," 504 F.2d at 799 n.68, with one important exception. We referred to "strong and uncontradicted evidence that it was very difficult for women of child-bearing age and for children to obtain an adequate supply of [iron] even from a balanced diet." We directed that, unless the Commissioner could contradict this, he should insert "a proper qualification." The qualification made was, 21 C.F.R. 105.60(b)(2):

> [R]epresentations may be made that it is often impractical to supply the iron requirements of infants, children, and women of childbearing age with a diet of conventional foods.

We agree with petitioners that this does not entirely capture our direction. It could well be read as saying that where it was "practical" for infants, children and women of childbearing age to obtain "a diet of conventional foods," their needs for iron would be fully met. The Commissioner gave no explanation for not complying with our mandate; counsel now tell us that he followed the language of finding of fact number 45 in the 1973 report, 38 F.R. 20715. However, the evidence went beyond the finding, as we intimated. Unless adequate contradictory evidence should now be forthcoming, the Commissioner shall comply with our direction with respect to iron.

### (d) *Refusal to make qualifications in respect of Vitamin B$_6$, Folic Acid and Magnesium.*

■ In our previous opinion, 504 F.2d at 801–02 n.73, we noted that while some petitioners claimed that a balanced diet did not supply adequate amounts of vitamin B$_6$, folacin and magnesium, they had failed to

supply us with the portions of the record alleged to demonstrate this. Although we had not so required, the Commissioner gave further consideration to this and concluded that he was "not aware of any substantial evidence to indicate that a balanced diet of ordinary foods cannot supply adequate amounts of these three nutrients." 41 F.R. 46169. We have reviewed the extracts of testimony now filed by petitioners and see no basis for faulting the Commissioner. Indeed, some of the testimony undermines petitioners' claims that vitamin B$_6$ and folacin are inadequately supplied by a normal diet. See WD–46, Olson, at 10.

### (e) *Difference between natural and synthetic vitamins.*

■ We previously upheld, 504 F.2d at 805, a provision of the regulations, now § 105.60(b)(6), proscribing representations "that a natural vitamin in a food is superior to an added or synthetic vitamin, or that there is a difference between vitamins naturally present and those that have been added." Petitioners complain that the Commissioner himself has now recognized such a difference with respect to vitamin K, 40 F.R. 23248. We do not think this exception with respect to a vitamin which is neither on the mandatory nor on the optional list requires a qualification. If sellers of vitamin K in its natural form desire relief, we assume the Commissioner will grant any relief that is warranted, see 504 F.2d at 784.

### (5) *Vitamins and minerals as food additives.*

■ A more important controversy relates to what is now § 105.85(f). This provision, which appeared for the first time in the May 1975 proposed rules, 40 F.R. 23249, now begins:

> Restrictions of the maximum potency of a vitamin or mineral may be imposed for reasons of safety by the act or by regulation.

It then cross-references seven code provisions defining certain dosages of specific

vitamins or minerals as dangerous.[19] Petitioners focus on the paragraph that follows:

(8) Any vitamin or mineral which is included in a dietary supplement and which is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown to be safe under the conditions of its intended use is a food additive within the meaning of section 201(s) of the act; and pursuant to sections 402(a)(2)(C) and 409 of the act, such inclusion is illegal in the absence of a food additive regulation approving such inclusion. A listing of some of the vitamins, minerals, and compounds with vitamin and/or mineral properties which are generally recognized as safe, and which thus may lawfully be included in a dietary supplement without a food additive regulation, appears at Subpart F of Part 182 of this chapter.[20]

Petitioners say that having been foiled by us, 504 F.2d at 788–89, and by Congress, see § 411(a)(1)(B), in his effort to classify high potency vitamins and minerals as drugs, the Commissioner is now seeking to reach essentially the same goal by threatening to treat added quantities as food additives.[21]

Examination of petitioners' objection requires a threading through the labyrinthine provisions of the Food, Drug and Cosmetic Act. Section 201(s) provides, with exceptions unnecessary to specify here:

The term "food additive" means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under

19. The extent to which petitioners challenge these seven cross-references is unclear. Preliminarily we note our assumption that the Commissioner will drop the cross-references to §§ 250.109 and 250.110 since those sections have recently been declared invalid by this court. *National Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325 (1977). The other regulations—effectively designating certain nutrients as food additives at specified potencies—to which the Commissioner cross-referenced have been in effect at least since 1974, see 21 C.F.R. §§ 3.15, 121.10, 121.101(d)(5), 121.1073, 121.1134 (1974), and would, we think, be applicable to dietary supplements even without the cross-references. This is the import of our holding, *infra*, concerning the broad definition of "food additive." See also 21 C.F.R. § 105.85(a)(4). Thus, if petitioners mean to challenge the inclusion of these cross-references, they are foreclosed from doing so because they have suffered no injury. If, on the other hand, they mean to challenge the underlying regulations this is neither the proper time nor the proper forum.

20. In the proposed rules published in May 1975, 40 F.R. 23248, the Commissioner advised "that he is planning to initiate new rule making to particularize more comprehensively than existing § 121.101(d)(5) the vitamins, minerals and compounds with vitamin and/or mineral properties which are GRAS (specifying potency limitations where recognition of safety depends upon such limited use) and to list as well those substances which are not GRAS at any level of use. Proposals for such rule making will appear in the Federal Register." He also announced his tentative views as to which vitamins and minerals (and in what potencies) were or were not generally recognized as safe or, in the FDA acronym, GRAS.

21. In addition to the statutory objection hereafter discussed, petitioners complain that addition of this provision was not within the scope of the remand. However, our order did not prohibit the Commissioner from making further changes in the regulations so long as they were not inconsistent with our opinion and petitioners were offered notice and an opportunity to comment on this additional provision, which they exercised. We note that since this was a regulation under § 409, rather than under §§ 401 or 403(j), the hearing on the record requirements of § 701(e) are not applicable.

the conditions of its intended use . . .

Food is defined in § 201(f):

The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

Under § 402(a)(2)(C) a food is deemed to be adulterated:

if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348 . . . . .

Section 409 rounds out the picture by providing in pertinent part:

(a) A food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe for the purposes of the application of clause (2)(C) of section 402(a), unless—

(1) it and its use or intended use conform to the terms of an exemption which is in effect pursuant to subsection (i) of this section; or

(2) there is in effect, and it and its use or intended use are in conformity with, a regulation issued under this section prescribing the conditions under which such additive may be safely used.

Section 301 prohibits, *inter alia*, introduction of adulterated foods into interstate commerce, receipt of adulterated goods or adulteration of goods in interstate commerce. Section 302 authorizes injunctive actions for violation of § 301; § 303 prescribes criminal penalties for such violations; and § 304 provides for seizure of adulterated foods.

Petitioners contend that vitamins and minerals are foods within § 201(f), see also the new § 411(c)(1) added in 1976, and that in the nature of things a "food" cannot be a "food additive," especially when it is just more of the same. Recognizing that the Commissioner must have power to prevent the sale of vitamin and mineral preparations of such high potency as to be dangerous, they say the Commissioner must proceed under more general provisions relating to adulteration on a case by case basis see, e. g. § 402(a)(1), (3)–(7), (b), rather than the more readily enforceable provisions relating to food additives.

The contention has its force, but, as the Fifth Circuit has noted

The sole criterion for identifying a food additive is whether a substance which may become a component of or affect the characteristics of any food be not generally recognized among qualified experts as having been shown to be safe . . . .

*United States v. 41 Cases More or Less*, 420 F.2d 1126, 1131 (1970). We do not believe a substance gains immunity from this criterion merely because it also qualifies as a food, cf. *United States v. Article of Food Consisting of 10 Drums, More or Less, of Orotic Acid*, 414 F.Supp. 793 (E.D.Mo.1976). Further, as Judge Gurfein has recently written for us:

Yet, when we are dealing with the public health, the language of the Food, Drug and Cosmetic Act should not be read too restrictively, but rather as "consistent with the Act's overriding purpose to protect the public health". *United States v. Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). As Justice Frankfurter said in *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943):

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words."

Thus, a provision concerning "food additives" has been held to include even poisonous substances which have not been "added" by human hands. *United States v. Ewig Bros. Co.*, 502 F.2d 715, 721–24 (7th Cir. 1974) (Stevens, *J.*), *cert. denied*, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423 (1975).

*United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 246 (1977) (footnote omitted). As then Judge Stevens wrote in the case cited, 502 F.2d at 721 (footnote omitted):

The legislative history of the 1958 Bill indicates concern about the difficulties present when dangerous substances could not be proscribed by per se rules. Since Congress used broad language in order to eliminate such difficulties, we should not construe it narrowly.

Congress has vested the Commissioner with broad "authority to promulgate regulations for the efficient enforcement" of the Food, Drug and Cosmetic Act, § 701(a), see *National Nutritional Foods, Inc. v. Weinberger*, 512 F.2d 688, 695–98 (2 Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); H.R.Rep. No. 94–1005, *supra* at 27–28, and we see no reason why he cannot determine that too much of even a good thing may come within the definition of a "food additive."

Still more important, Congress, which most likely was aware of the May 1975 regulations, seems to have held that view. The Senate decided not to include in the 1976 legislation a provision prohibiting FDA from regulating safe vitamins, minerals, and associated ingredients as food additives, stating in the report on the bill:

This was not done for two reasons. First of all, it is unnecessary. It would be inappropriate and contrary to the intention of this Title for the FDA to treat vitamins, minerals, and their associated ingredients about whose safety there currently is no doubt, as food additives. There are those who considered vitamins and minerals essentially foods with a long history of safe use. The authors rejected that course of action on grounds that there was insufficient evidence to support such a course of action at this time.

Second, there are some nutrients and ingredients or natural chemicals which are tangentially a part of vitamins or minerals which currently may be considered food additives because of their potential toxicity. We did not wish to prevent the FDA from acting in these circumstances. For the agency to do so based on the policies on potency and combinations which this amendment endorses, however, would be inappropriate.

S.Rep. No. 94–509, 94th Cong., 1st Sess. 40–41 (1975). And the House Conference Report observed:

Similarly, if any vitamin, mineral or other food ingredient is not generally recognized as safe by qualified experts and meets the other criteria of the definition of a "food additive" under section 201(s) of the Act, it would be subject to regulation under section 409 of the Act. If such a vitamin, mineral or other ingredient is intentionally added to a food, such food is adulterated (within the meaning of section 402(a)(2)(C) of the Act) unless its use is in conformity with a regulation issued by the Secretary which prescribes the conditions under which it may be safely used or exempts it for investigational use by qualified experts. It is on precisely this basis that the Secretary has, by regulation, restricted the potency of the vitamin folic acid that may be added to a food.

H.R.Rep. No. 94–1005, *supra* at 28; U.S. Code Cong. & Admin.News 1976, p. 752.

We therefore find no infirmity in § 105.-85(f).[22]

(6) *Potency on expiration date.*

The final regulations contain a provision also present in the 1973 regulations, requiring that the labels of dietary supplements carry an expiration date and that on such date the dietary supplement "contain not less than the quantity of each such vitamin and/mineral, as set forth on its label," 21 C.F.R. § 105.85(1). Petitioners object to the latter provision because of its failure to allow for any tolerance, as is done in the U.S. Pharmacopoeia. Since this

---

22. We assume, of course, that the Commissioner will act consistently with the second parenthetical clause of § 201(s).

point could have been but was not taken by petitioners on the prior review, we think it now comes too late, although the Commissioner is free to consider it if he desires.

The regulations are vacated and the cause is remanded to the Commissioner for further proceedings consistent with this opinion.