UNITED STATES of America, Plaintiff-Appellee,

v.

AN ARTICLE OF FOOD, etc., Defendant,

FoodScience Laboratories, Inc., Claimant-Defendant-Appellant.

No. 81–1114.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1981.

Decided May 21, 1982.

Robert Ullman, New York City, for claimant-defendant-appellant.

Stephen D. Terman, Asst. Chief Counsel for Enforcement, Food and Drug Administration, Rockville, Md., for the U. S.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and CUDAHY, Circuit Judge.

CUMMINGS, Chief Judge.

The United States filed its amended complaint in this *in rem* food condemnation case in May 1979. The defendant food comprises numerous cases containing tablets of Aangamik 15, also known as "Calcium Pangamate," "Pangamic Acid," "Vitamin B–15," "Gluconic 15," "Sport 15," or "the famous Russian formula." Aangamik 15 is produced in Burlington, Vermont by the other defendant and claimant herein, Food-

Science Laboratories, Inc., and then shipped to various points around the country. According to the government's complaint, the tablets are an adulterated food under 21 U.S.C. § 342(a)(2)(C) of the Federal Food, Drug and Cosmetic Act in that they contain a food additive—N,N–Dimethylglycine hydrochloride ("DMG")—which allegedly is unsafe under 21 U.S.C. § 348(a).

The government also claimed that the Aangamik 15 is misbranded under 21 U.S.C. § 343(a) because the label describes the article as "Vitamin B–15," although calcium pangamate is neither a vitamin nor a provitamin and since indeed "there is no accepted scientific evidence which establishes any nutritional properties of the substance or has identified a deficiency of calcium pangamate in men or animals * * *." The government further charged that the substance was misbranded because it is "fabricated from two or more ingredients and its label fails to bear the common or usual name of each such ingredient * * *." Finally, the government alleged that FoodScience violated 21 U.S.C. § 331(a) by introducing this "adulterated and misbranded" article of food into interstate commerce. The government therefore urged the district court to condemn these cases of Aangamik 15 and to enjoin FoodScience from delivering any more of it into interstate commerce.

FoodScience denied the critical paragraphs of the amended complaint and the six consolidated cases were tried without a jury during the week of December 12, 1979. On October 29, 1980, the district court decided all issues in favor of the government. *United States v. An Article of Food, etc.,* 503 F.Supp. 925 (N.D.Ill.1980). Judge Roszkowski first held that DMG is a food additive and, because the parties stipulated that the Secretary had issued no exempting regulations under 21 U.S.C. § 348(i), that DMG is deemed to be unsafe under 21 U.S.C. § 348(a).[1] The court next held that the

---

1. 21 U.S.C. § 348(a) and (i) provide as follows:
   (a) A food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe for the

purposes of the application of clause (2)(C) of section 342(a) of this title, unless—
   (1) it and its use or intended use conform to the terms of an exemption which is in

tablets under seizure are adulterated under 21 U.S.C. § 342(a)(2)(C) and misbranded under 21 U.S.C. § 343(a) and (i)(2). Therefore, in January 1981, the district judge entered an order condemning the 60 cases involved in the consolidated cases and enjoined FoodScience from manufacturing or introducing Aangamik 15 into interstate commerce except "when offered as a single ingredient for food use."[2] This appeal by FoodScience followed.

## I

The relevant provisions of the Federal Food, Drug, and Cosmetic Act are straightforward. "A food shall be deemed to be adulterated—* * * if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348 of this title * * *." 21 U.S.C. § 342(a)(2)(C). Under Section 348, a food additive is presumed to be unsafe unless the Secretary of Health and Human Services has promulgated a regulation "prescribing the conditions under which such additive may be safely used" or providing for "investigational use by qualified experts." 21 U.S.C. § 348(a) and (i). The parties stipulated prior to trial that Aangamik 15 is a food and, as noted, that the Secretary has promulgated no exempting regulations regarding the Aangamik 15 component DMG. The remaining question in the determination whether Aangamik 15 is an adulterated food, then, is whether DMG is a "food additive."

The Federal Food, Drug, and Cosmetic Act defines "food additive" as follows:

The term "food additive" means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use * * *.

21 U.S.C. § 321(s). The district court found that DMG was not commonly used in food prior to January 1, 1958, and FoodScience has not challenged that finding on appeal. Rather, FoodScience asks us to set aside the district court's findings that under the foregoing definition (1) DMG is an "additive" (a "substance the intended use of which results * * * in its becoming a component or otherwise affecting the characteristics of" Aangamik 15), and (2) DMG is not "generally recognized as safe."

### DMG Is an "Additive"

Even though DMG is quite clearly a "substance" that has become a "component" of Aangamik 15, FoodScience would have us read into the definition of "food additive" an exception for substances that become "principal ingredients" of the food

effect pursuant to subsection (i) of this section; or

(2) there is in effect, and it and its use or intended use are in conformity with, a regulation issued under this section prescribing the conditions under which such additive may be safely used.

While such a regulation relating to a food additive is in effect, a food shall not, by reason of bearing or containing such an additive in accordance with the regulation, be considered adulterated within the meaning of clause (1) of section 342(a) of this title.

\*   \*   \*   \*   \*   \*

(i) Without regard to subsections (b) to (h), inclusive, of this section, the Secretary shall by regulation provide for exempting from the requirements of this section any food additive, and any food bearing or containing such additive, intended solely for investigational use by qualified experts when in his opinion such exemption is consistent with the public health.

2.  The government has not cross-appealed from the single-ingredient exception to the injunction and thus we do not consider whether the district court could (or should) have issued an injunction without the exception.

to which they are added. Although DMG is the lesser of two active components of the tablets (Tr. 154, 755) and accounts for less than 4% of each tablet's weight (Record 10, 77 C 1647, Claimant's Answers to Plaintiff's Interrogatories, p. 11), FoodScience argues that DMG is a "principal ingredient" because the tablets' consumers are particularly hopeful of "the potential usefulness of DMG as a metabolic enhancer (whether or not it is a nutrient in the strict sense) * *." Reply Brief 5. Since many ordinary additives come in relatively small quantities and food manufacturers often attempt to make their presence inconspicuous, an exception from the definition for "principal ingredients" might agree with the notion of "food additive" used in common parlance. But had Congress intended the Food and Drug Administration and the courts to rely on common parlance it would not have so carefully crafted the foregoing definition of the term.[3]

FoodScience argues it is apparent from the statutory definition that Congress intended to limit the definition of "food additive" to substances that become a component of or affect food in some subtle or incidental fashion, such as substances "intended for use in producing, manufacturing, packing, processing etc." 21 U.S.C. § 321(s) (parenthetical clause), supra, p. 737. Once again, therefore, important and principal ingredients like DMG in Aangamik 15 should be excepted from the definition, according to FoodScience. The argument is ironic. In drafting Section 321(s), Congress obviously was concerned with creating a very broad definition of food additive that could not be escaped by food purveyors claiming that particular substances were present in too small a quantity or had affected the food too indirectly. FoodScience's argument is that because Congress was concerned with small amounts of unsafe substances, Congress could not similarly be concerned with unsafe substances present in relatively larger quantities. But the definition itself shows the absurdity: "[t]he term 'food additive' means any substance the intended use of which results * * * in its becoming a component * * * of any food * * *." The term "component" of course includes large quantities of unsafe substances as well as small quantities.

The case law agrees with our interpretation. For example, in National Nutritional Foods Ass'n v. Kennedy, 572 F.2d 377, 389–392 (2d Cir. 1978), the Court of Appeals concluded that the Food and Drug Administration may regulate high-potency vitamins and minerals as "food additives." The pill manufacturers in that case argued "that vitamins and minerals are foods [by themselves] * * * and that in the nature of things a 'food' cannot be a 'food additive,' especially when it is just more of the same [i.e., a high-potency vitamin or mineral]." Id. at 391. The Court answered that "We do not believe a substance gains immunity from [being a food additive] merely because it also qualifies as a food, * * * we see no reason why [the Food and Drug Administration] cannot determine that too much of even a good thing may come within the definition of a 'food additive.'" Id. at 391, 392.[4] See also United States v. Article of

---

3. Most primary food ingredients known in common parlance not to be "food additives" are excepted from the statutory definition because either (1) they were used in food prior to 1958 and from common experience are believed to be safe or (2) apart from when they were used in food, they are generally recognized as safe using scientific methods. Thus FoodScience's citation of testimony before the House Subcommittee on Health and Science to the effect that the chocolate in chocolate ice cream cannot be a food additive is correct but irrelevant. Food Additives: Hearings on H.R. 13254 Before the House Subcommittee on Health and Science 101-102 (1958). Chocolate is not a food additive because it was in use before 1958 and is known to be safe from common experience.

4. The language of Section 342 also makes clear that Congress did not intend that foods cannot be food additives. Section 342(a)(2)(C) leaves open that a food may be a food additive when it states, "A food shall be deemed to be adulterated—* * * if it is, or it bears or contains, any food additive which is unsafe * * *" (emphasis supplied). Similarly, Food and Drug Administration regulations provide: "The word 'substance' in the definition of the term 'food additive' includes a food or food component

*Food, etc.*, 414 F.Supp. 793 (E.D.Mo.1976), affirmed mem., No. 76–1554 (8th Cir. 1977) ("Orotic Acid" sold as a dietary supplement is a "food additive"); *United States v. 41 Cases, More or Less, etc.*, 420 F.2d 1126, 1131 (5th Cir. 1970) (primary components of "Ferro-Lac" medicated chicken feed are "food additives").

The practical effect of holding that DMG is an additive is to place the burden of showing safety upon FoodScience. In order to avoid the label "food additive," FoodScience must now show that DMG is "generally recognized as safe," whereas if DMG were not an "additive," the Food and Drug Administration would have the burden under 21 U.S.C. § 342 of proving by a preponderance of the evidence that DMG is "injurious to health." See *United States v. Ewig Bros. Co., Inc.*, 502 F.2d 715, 718–719 (7th Cir. 1975), certiorari denied, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423; *United States v. General Foods Corp.*, 446 F.Supp. 740, 753 (N.D.N.Y.), affirmed mem., 591 F.2d 1332 (2d Cir. 1978).

In *Ewig Bros.*, then Circuit Judge Stevens resolved the difficult question of whether DDT in fish was an "additive" by viewing it as a matter of assigning the burden of proving safety. In that case, placing the burden on the government might entail inconsistent decisions by different federal judges determining danger to health on a case-by-case basis; whereas, since DDT is not generally recognized as safe, placing the burden on the fishing industry (by deeming the DDT to be an "additive") would mean that "all of the fish in the Great Lakes are 'adulterated' as a matter of statutory definition." 502 F.2d at 717, 719. To decide who should bear the burden of showing safety, Judge Stevens examined the history of adulterated food regulation prior to the Food Additives Amendment of 1958 and concluded that it "reflected a consistent desire to rationalize the law by reducing the circumstances in which the F.D.A. must prove actual danger to a quantity of food and by establishing a system of tolerances which will protect the

consisting of one or more ingredients." 21

public and enable industry to operate effectively." *Id.* at 721. With regard to the 1958 Act's definition of "additive," Judge Stevens found that "[a]lthough Congress was primarily concerned with substances used by a food processor, neither the language nor the history of the 1958 Act limits its application to such substances. The words 'the intended use of which' are not confined, as they easily could have been confined, to use in food processing." *Id.* at 722 (footnote omitted). Thus DDT was held to be a food additive and the Food and Drug Administration would not have the burden of proving injury, but rather under 21 U.S.C. § 348 it would be permitted to set uniform tolerances for consumption of DDT in fish. As Judge Stevens noted in a footnote,

> [T]his court is acutely aware of the fact that it is not the proper body to more narrowly define broad standards in this area so that they can be applied in a particular case. Courts know neither what is necessary for the health of the consuming public nor what can reasonably be expected from the [various food] industr[ies]. Furthermore, this is not a determination that should be made individually for each case on the basis of expert testimony. The Food and Drug Administration should set definite standards in each industry which, if reasonable, and in line with expressed Congressional intent, would have the force of law.

*Id.* at 722 n.27 (quoting *United States v. 1,500 Cases More or Less, Tomato Paste*, 236 F.2d 208, 211 (7th Cir. 1956)).

If FoodScience cannot shoulder the burden of proving that DMG is "generally recognized as safe" and cannot persuade the Food and Drug Administration to grant an exemption under 21 U.S.C. § 348, it would certainly be unwise for this Court to create a judicial exception from the definition of "food additive" for DMG simply because it is a primary ingredient of Aangamik 15. When the quality and magnitude of hazards potentially associated with a new food prod-

C.F.R. § 170.3(g).

uct are as uncertain as they are here,[5] the proper judicial response is aversion to the risks and strict enforcement of the regulatory framework for risk management established by Congress. See M. Shapo, A Nation of Guinea Pigs 248–262 (1979).

### DMG Is Not "Generally Recognized as Safe"

■ The second half of the statutory definition of a food additive requires that the substance "not be generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures * * * to be safe under the conditions of its intended use." 21 U.S.C. § 321(s). The district court found that DMG is not "generally recognized as safe," and this finding was amply supported by the evidence. Five experts presented by the government all testified that DMG is not generally recognized among experts as safe. FoodScience's four experts testified that DMG is safe at the dosages used in Aangamik 15, but only one of these experts testified that DMG is "generally recognized as safe." Judge Roszkowski, who heard the expert witnesses, was entitled to credit the testimony of the government's five doctors that DMG is not generally recognized among qualified experts as safe for its intended use of human consumption in these tablets.

Because it meets the two statutory tests in Section 321(s), the DMG contained in these tablets is a food additive. Since DMG has not been exempted by the Food and Drug Administration pursuant to 21 U.S.C. § 348, it is an unsafe food additive and the tablets are an adulterated food under 21 U.S.C. § 342(a)(2)(C).

### II

The district court also held that the tablets are misbranded under 21 U.S.C. § 343 because (1) the labels all suggest that the tablets contain a vitamin whereas the stipulation of facts and testimony show that the tablets contain no vitamin or pro-vitamin, and (2) the labels do not bear the common or usual name of each ingredient in the tablets.[6] FoodScience has not challenged that its tablets are misbranded.

Since the tablets were both adulterated and misbranded, the district court concluded that they should be condemned under 21 U.S.C. § 334, which permits the condemnation of any article of food "that is adulterated or misbranded." FoodScience has not contested this corollary to the adulteration and misbranding.

Finally, the district court enjoined FoodScience pursuant to 21 U.S.C. § 332(a) from introducing Aangamik 15 into interstate commerce in food or drug form.[7] FoodScience complains that the injunction is overbroad because there was no proof that Aangamik 15 would be unsafe as a drug. However, the district judge provided FoodScience with appropriate escape hatches for marketing the tablets as a drug should the tablets be found safe for drug usage. Specifically, FoodScience has been enjoined regarding Aangamik 15 *as a drug* only

---

5. There was considerable testimony at trial relating to whether DMG would cause cancer when combined with substances naturally present in the human body.

6. 21 U.S.C. § 343(a)(1) and (i)(2) provide in pertinent part:

    A food shall be deemed to be misbranded—
    * * * * * *
    (a) If (1) its labeling is false or misleading in any particular,
    * * * * * *
    (i) * * * unless its label bears * * * (2) in case it is fabricated [as here] from two or more ingredients, the common or usual name of each such ingredient * * *.

7. 21 U.S.C. § 332(a) provides in pertinent part:

    The district courts of the United States and the United States courts of the Territories shall have jurisdiction * * * to restrain violations of section 331 of this title, except paragraphs (h)–(j) of said section.

    In particular, 21 U.S.C. § 331(a) provides:

    The following acts and the causing thereof are prohibited:

    (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

until (1) an approved application filed pursuant to 21 U.S.C. 355(b) is effective with respect to said drug, or (2) a Notice of Claimed Investigational Exemption for such drug, filed by defendants pursuant to 21 U.S.C. 355(i) and 21 CFR 312.1, has been accepted as adequate by the United States Food and Drug Administration. (App. 3)

Any competitive disadvantage that Food-Science may suffer as a result of following the above procedures is more than offset by the need the district court perceived to prevent FoodScience from circumventing the injunction. FoodScience should not be permitted to market adulterated foods by relabeling them as drugs.

Affirmed.

CUDAHY, Circuit Judge, concurring.

I concur fully in Chief Judge Cummings' conclusion that the government in this case properly condemned defendant's "Aangamik 15" tablets as an adulterated food because they contain an unsafe "food additive"—DMG—for which no exempting regulations have been issued. I write separately only to emphasize that, in my view, characterizing DMG as a "food additive" depends critically on its being added to or sold in combination with other active ingredients. Because FoodScience consistently represented to the public, and maintained throughout the pre-trial stages of this proceeding, that its "Aangamik 15" tablets contained *two* active and beneficial ingredients—DMG and calcium gluconate—I agree

that the district court properly found DMG to be a "food additive" within the meaning of 21 U.S.C. § 321(s) (1976).[1] I believe, however, as did the district court,[2] that this would be a far different case if DMG were being marketed as a single food ingredient. In that case, the FDA would not be entitled to rely on the "food additive" presumption to condemn plaintiff's product but would instead be obligated to shoulder its normal burden of proving, by a preponderance of the evidence, that DMG was an "adulterated food" within the meaning of 21 U.S.C. § 342(a)(1) (1976)[3] or that the product was "misbranded" under the standards set forth in 21 U.S.C. § 343 (1976).

Limiting the definition of "food additive" to substances which are either added to or sold in combination with other active ingredients not only comports with common usage, but also makes sense from the point of view of informing the consumer. When food substances such as DMG are combined with other "beneficial" ingredients and sold under such unrevealing brand names as "Aangamik 15," "Calcium Pangamate," or "the famous Russian formula," consumers may well be unaware of the presence of, or potential dangers associated with, each of the product's individual ingredients; a broad prophylactic rule such as the burden-shifting "food additive" presumption is therefore appropriate. When substances such as DMG are marketed in pure form, however, *and are properly labeled as such,* consumers can more reasonably be expected to know what they are buying and, thus, can safely be given the opportunity to

---

1. In its appellate briefs, FoodScience attempts to argue, apparently for the first time, that DMG is the sole active ingredient in Aangamik 15 and that all the other components of the tablet—including calcium gluconate—are merely buffering agents, lubricants or binder/fillers. Appellant's Br. at 8; Reply Br. at 5–7. This contention is not supported by the record and is belied by FoodScience's own Answers to Interrogatories. *See* Tr. 778; R. 10 (No. 77 C 1647); R. 22 (No. 77 C 662).

2. *See ante* at 3 & n.2.

3. 21 U.S.C. § 342(a)(1) provides that a food shall be deemed adulterated

   If it bears or contains any poisonous or deleterious substance which may render it

injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health.

Under this provision the FDA may condemn a given food product only if the FDA can establish by a preponderance of the evidence that the product is in fact poisonous or deleterious and that it might in fact be injurious to health. *See United States v. Lexington Mill & Elevator Co.,* 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914); *United States v. 2,116 Boxes of Boned Beef,* 516 F.Supp. 321 (D.Kan.1981).

weigh for themselves the benefits and risks of their purchase. Of course, if DMG is in fact deleterious or dangerous to human health, the FDA may condemn it as an "adulterated food" under 21 U.S.C. § 342(a)(1) (1976).

In sum, I do not believe that merely because DMG may be properly classified as an "unsafe food additive" (since not generally recognized as safe) when sold as part of a multi-ingredient tablet, it may also be automatically condemned, via the "food additive" presumption, as an "adulterated food" when marketed alone. *Accord United States v. An Article of Food Consisting of . . . L–Tryptophan*, Civ. 77–687 (D.N.J. Jan. 23, 1979). The 1958 food additive amendment was designed to provide an extra measure of protection against the introduction into foods and food products of untested and potentially unsafe flavor, texture, processing and preservative agents. *See* S.Rep.No.2422, 85th Cong., 2d Sess. 1958, *reprinted in* [1958] U.S.Code Cong. & Ad.News 5300, 5304. It should not be stretched so far beyond its intended purposes as to significantly displace the FDA's normal condemnation procedures.