SCHOONOVER, Judge.
Appellant, Burke Pest Control, Inc. (Burke), has appealed three final judgments entered pursuant to a jury verdict in an action brought by appellee, Joseph Schlitz Brewing Company (Schlitz), against Burke and Superior Fertilizer and Chemical Company (Superior). We find no error in the judgment entered in favor of Superior against Burke or in the now satisfied judgment in favor of Schlitz against Superior. We, therefore, affirm those judgments and direct our attention to the judgment entered in favor of Schlitz against Burke.
Schlitz is engaged in the brewing, sale, and distribution of beer, including the manufacture and warehousing of aluminum cans used in the canning of that beer. Burke is engaged in the pest control business. The parties entered into a contract for the fumigation of three warehouses in which numerous empty beer cans were being held by Schlitz. The contract required the use of a fumigant known as methyl bromide. Burke purchased the methyl bromide which contained two percent chlorop-icrin, a tearing agent required as a warning device in the fumigation of structures, from Superior. The fumigant supplied by Superior also contained an unlabeled contaminant later identified as stoddard solvent (an oil similar to kerosene or mineral spirits). As a result of the fumigation, a small percentage of the cans were impregnated with the stoddard solvent, and the liners of most of the fifty-four million cans were left with a residue of chloropicrin.
Upon discovery of the residues, laboratory tests were conducted, and Schlitz concluded that approximately ten to sixty-six nanograms of chloropicrin remained on the can liners, resulting in some chloropicrin migrating into the beer when the cans were filled. A nanogram is one billioneth of a gram (.000000001 gram). Later tests showed that the chloropicrin level dropped within six months to approximately 2 to 3.6 nanograms per can as the chloropicrin began to evaporate. Schlitz then decided that as a result of the fumigation and the chlo-ropicrin and stoddard solvent residues, the cans could not be used and they were disposed of.
Schlitz filed suit against Burke and Superior for breach of contract, breach of warranty, negligence, and strict liability. Schlitz alleged that because of the contamination of the cans, they were rendered unfit for their intended use and therefore unusable.
Burke counter-claimed for breach of the fumigation contract and filed a cross-claim against Superior. Burke alleged that any liability incurred was the responsibility of Superior because of Superior’s breach of express warranty, implied warranty, and negligence.
At the conclusion of the trial, the trial court accepted Schlitz’ position that chlo-ropicrin is an incidental food additive pursuant to the Food Additive Amendment of 1958 (Florida Counterpart is chapter 500, *97 Florida Statutes), and the jury was instructed that:
[I]f you find that some or all of the fumigated beer cans of Schlitz contained any amount of chloropicrin or Stoddard solvent by reason of the fumigation, and if you also find that any amount of such chloropicrin or Stoddard solvent would have migrated into some or all of the beer placed in those cans — in those Schlitz beer cans, then as to those beer cans and as to that beer there is adulteration as a matter of Law, whether or not any human health hazard was shown to exist thereby.
The jury found in favor of Schlitz on its contract, negligence, and warranty claims and returned a verdict against Burke and Superior. Total damages of $1,491,600 were awarded with a 90-10 percent allocation of responsibility to Burke and Superior respectively. Judgments were entered against Burke and Superior, and a third judgment was entered against Burke on its cross-claim against Superior. Superior then paid Schlitz the amount of the judgment entered against it and obtained a satisfaction.
We find that the trial court erred in its instructions to the jury and hold, under the circumstances of this case, that chloropicrin is an accidental food additive that is not embodied within the Food Additive Amendment of 1958. Accordingly, we reverse the final judgment entered in favor of Schlitz against Burke in the amount of $1,340,440.
A review of the federal legislation concerning adulterated food is necessary to determine the role of the Federal Food, Drug, and Cosmetic Act in the case sub judice.
The first federal statute governing food safety was the Food and Drug Act of 1906. That act declared adulterated any food that contained any added poisonous or other “added substance” which may render it injurious to health. Act of June 30,1906, ch. 3915, 34 Stat. 768 (repealed 1938). The Act did not define the term added substance, but the concept was understood to embrace substances intentionally incorporated into food as ingredients, or applied during processing. See Merrill, Regulating Carcinogens in Food: The Legislature’s guide to the food safety provisions of the Federal Food, Drug, and Cosmetic Act, 77 MICH.L. REV. 171 (1978).
In 1938 congress expanded its control over toxicants in foods by enacting the present Federal Food, Drug, and Cosmetic Act of 1938 (the Act). 21 U.S.C. § 342(a) (1938). Section 342(a)(1) declares adulterated any food that bears or contains any poisonous or deleterious substance which may render it injurious to health. However, food which does not contain any added substance is not considered adulterated if the quantity of the poisonous or deleterious substance does not ordinarily render it injurious to health. Thus, the Act retained the distinction between substances that are added and those that are not, but like the 1906 law neglected to define what constitutes “added.”
In the 1938 Act itself, congress recognized that certain added toxicants in food required special treatment and empowered the Federal Drug Administration (FDA) to establish tolerances for added poisons or deleterious substances whose occurrences in food cannot be avoided, or whose use is necessary in the production of food. In substance, congress authorized the FDA to license the use of some potentially toxic substances of food. 21 U.S.C. § 346 (1938).
Accordingly, with the passage of the 1938 Act, toxicants were regulated under three different standards: (1) the “ordinarily injurious” test applied to substances that were not added, (2) the “may render injurious” test applied to added poisonous or deleterious substances that were neither necessary or unavoidable, and (3) established tolerances for added substances whose use was necessary in the production of food or which was unavoidable by good manufacturing practice.
The 1938 Act has been amended several times. The first amendment is the Pesticide Residue Amendment of 1954. This amendment provides that a raw agricultural commodity shall be deemed adulterated if it bears any residue of pesticide and does *98 not conform to an established tolerance. 21 U.S.C. § 346a (1954). The second amendment is the Food Additives Amendment of 1958. This amendment establishes a licen-sure scheme similar in concept to that for pesticide residues or substances intended to be used as ingredients in formulated foods. It also applies to substances that become or can reasonably be expected to become components of food (i.e., packages which contain food). 21 U.S.C. § 348 (1958). In 1960 congress amended the Act a third time. This amendment deals with substances used to color foods, drugs, cosmetic, and medical devices. 21 U.S.C. § 376 (1960). The most recent modification of the 1938 Act is the Animal Drug Amendment of 1968. This amendment established a unified licensure system for evaluating drugs used in food producing animals. 21 U.S.C. § 360b (1968).
In the instant case, the Pesticide Residue Amendment of 1954 is not applicable because the beer in question is not a raw agricultural commodity. Similarly, the third amendment in 1960 is inapplicable because chloropicrin is not a substance used to color foods, drugs, cosmetics, and medical devices. The Animal Drug Amendment of 1968 is likewise inapplicable because chlo-ropicrin is not a drug used in food producing animals. Finally, the Food Additive Amendment of 1958 is not applicable, as appellee contends, because, as hereinafter discussed, the Amendment only deals with intentional and incidental additives and does not apply to accidental food additives.
Under the Food Additive Amendment of 1958, the term food additive is defined as:
The term “food additive” means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food. [Emphasis added.] 21 U.S.C. § 321(s).
According to S.Rep. No. 2422, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad.News 5300, the amendment was designed to prohibit the use of food additives which had not been adequately tested to establish their safety. It was designed to shift the burden of proof to a processor of food, rather than the government, to prove that a new and unapproved additive is safe for human consumption. The amendment was enacted in reaction to existing law which permitted a food processor to endanger health by using an untested additive for as long as it might take for the government to suspect the additive, to research it, and to determine its safety.
Also according to the report, the Amendment encompasses substances which are added intentionally to food and are generally referred to as intentional additives. The Amendment also covers incidental additives which are substances that may reasonably be expected to become a component of any food or affect the characteristic of any food. Examples of intentional and incidental additives are substances intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding foods. Accidental additives, however, are not embodied in the Food Additive Amendment of 1958. These are substances which may accidentally get into food, as for example, paints or cleaning solutions used in food processing plants. They are referred to as accidental because, if properly used, they may not reasonably become a component of food or otherwise affect the characteristics of food. If accidental additives do get into the food, the provisions of the Food, Drug, and Cosmetic Act dealing with poisonous and deleterious substances would be applied and not the Food Additive Amendment of 1958. S.Rep. No. 2422, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad.News 5300.
Additionally, any processor of food who intends on using a food additive within the meaning of the Food Additive Amendment of 1958, is required to file with the secretary a petition for regulation prescribing the conditions under which the food additive may be safely used. It is incumbent *99 upon the processor to include a proposed use of such additive, a report on the physical or other technical effect such additive is intended to produce, and information of the methods and controls used in conducting such investigations. In the instant case, Schlitz had no intention that chloropicrin be placed in the beer and accordingly could never have sought regulation under this amendment.
Therefore, the Amendment was intended to cover substances which were added intentionally to food, e.g., preservatives, or substances that are incidentally a part of the process, e.g., lead used in sealing cans, and which may reasonably become a component of any food or affect the characteristic of food. The Amendment, however, does not apply to substances accidentally falling into food, i.e., paint, cleaning solutions or, in the case sub judice, chloropicrin.
The appellee’s reliance on the case of National Nutritional Foods Assoc. v. Kennedy, 572 F.2d 377 (2d Cir.1978), is misplaced. In that case, the additive considered was one that the processor intended to make as part of the dietary supplement that was being manufactured and sold. Here none of the parties, as evidenced by the contract which provided there would be no residuary action, intended to add chlo-ropicrin to the beer.
The appellee’s reliance on the case of United States v. Ewig Bros., Co., 502 F.2d 715 (7th Cir.1974), is likewise misplaced. In Ewig, the Seventh Circuit Court of Appeals held that DDT found in smoked chubs was a food additive and since it was not protected by any tolerances, the chubs were adulterated as a matter of law. The court found DDT in the defendant’s processed fish to be a food additive within the meaning of section 321(s) of the Act. However, without the application of that section to the fish in question, the fish before processing were still subject to regulation under the Pesticide Chemical Act.
The court’s ruling avoided the necessity of duplicate tolerances, one covering the use of chemicals on a raw commodity, and the second applying to the same chemical after processing. Any other interpretation would result in an anomaly that a chemical such as DDT would adulterate raw fish, but processed fish containing the same DDT would be adulterated only when the government can prove that the fish may be injurious to health.
In the case sub judice, we are not dealing with a product that is covered by any other amendment in existence prior to the Food Additive Amendment. The term food additive is defined as any substance the intended use of which results in it becoming a component in a food. United States v. An Article of Food, 678 F.2d 735 (7th Cir.1982). Burke did not intend or expect the chloropicrin to leave any residue on the cans. While Burke did “intend” to fumigate the warehouse, the chloropicrin was “unintentionally” introduced into the food manufacturing process. This one time accidental occurrence did not make the chloropicrin become a food additive under the Amendment.
In An Article of Food, the circuit court found that the substance involved in that case was an intentional additive, and therefore, the burden of proving safety was placed upon the processor. The court held that if the substance involved was not an intentional additive, as in the case sub judi-ce, the food and drug administration would have the burden of proving, under section 21 U.S.C. section 342 (1938), that the substance may be injurious to health.
As a result, since chloropicrin is neither an intentional nor an incidental food additive, the Food Additive Amendment of 1958 cannot be applied to the facts of the instant case. Consequently, chloropicrin, an accidental additive, becomes governed by the poisonous and deleterious substance provision of the Food, Drug, and Cosmetic Act. S.Rep. No. 2422, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad.News 5300. Therefore, in order for the beer in question to be adulterated, Schlitz had the burden of showing that the beer contained a poisonous and deleterious substance which may render it injurious to health. United States v. Anderson Seafoods, Inc., 622 F.2d *100 157 (5th Cir.1980). Accordingly, the instruction given by the trial court which, in effect, made Burke liable as a matter of law, is erroneous, and we must reverse for a new trial.
REVERSED and REMANDED.
GRIMES, A.C.J., and SCHEB, J., concur.