UNITED STATES of America, Plaintiff–Appellee,

v.

45/194 KG. DRUMS OF PURE VEGETABLE OIL, et al., Defendant,

Efamol, Ltd., Claimant–Appellant.

No. 90–55086.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 1991.

Decided April 7, 1992.

James R. Phelps, Hyman, Phelps & McNamara, Washington, D.C., for claimant-appellant.

Mary K. Pendergast, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., for plaintiff-appellee.

Before: KOZINSKI and O'SCANNLAIN, Circuit Judges, and McNAMEE,* District Judge.

McNAMEE, District Judge:

## FACTS

Appellant, Efamol Ltd., Surrey, England, researches, exports and markets evening primrose oil (EPO). EPO is made from the crushed seeds of the evening primrose plant. Efamol sells EPO as a dietary supplement of fatty acids.

In February 1979, the Food and Drug Administration (FDA) informed Efamol representatives that EPO was not generally recognized as safe for use as a dietary supplement. If Efamol wanted to export EPO to the United States, it would have to file a Food Additive Petition with the FDA, pursuant to 21 C.F.R. section 171, or an affirmation petition in accordance with 21 C.F.R. section 170.35. Efamol informed the FDA it would no longer export EPO to the United States.[1]

Despite Efamol's assertion that it would not export EPO to the United States, Efamol has been shipping bulk EPO from the United Kingdom to Banner Gelatin Products (Banner) in Chatsworth, California since 1985. Banner mixes EPO with vitamin E and puts the combined mixture into soft gelatin capsules. The capsules are then shipped to distributors, who market them as a dietary supplement.

On January 6, 1989, the FDA filed a Complaint for Forfeiture under 21 U.S.C. section 334(a)(1), seeking the seizure and condemnation of forty-five barrels of EPO, labeled "PURE VEGETABLE OIL." Pursuant to a district court order the United States Marshal seized the oil on January 31, 1989.

The parties filed cross motions for summary judgment. The district court granted the government's motion for summary judgment, finding: (1) EPO was misbranded under 21 U.S.C. section 343; and (2) EPO is an unsafe food additive pursuant to 21 U.S.C. section 321. Efamol appeals the district court's decision. For the reasons set forth below we affirm the district court's decision.

### I.

We review the granting of a motion for summary judgment de novo. *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.

---

* The Honorable Stephen M. McNamee, United States District Judge for the District of Arizona, sitting by designation.

1. In 1985 the FDA issued Import Alert 66–04 for Evening Primrose Oil. The FDA revised the alert in June 1985. The alert instructs FDA officials to detain evening primrose oil labeled for food use because the agency considers it an unsafe food additive. However, Alert 66–04 provides that the oil may be sold as a food or drug if: (1) when sold as a drug, it is considered a new drug and the responsible person hold an approved new drug application or (2) when sold as a food, it is considered a food additive, and prior to marketing a food additive petition is submitted to FDA in accordance with 21 C.F.R. sections 170.35 and 171.1 and is approved by the FDA. Efamol did not submit a new drug application or a food additive petition to the FDA.

1985). Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## II.

■ Food shall be deemed misbranded unless its label bears the "common or usual name" of the product. 21 U.S.C. § 343(i). It is not necessary to show that anyone was actually misled or deceived, or that there was any intent to deceive. "The statute ... condemn[s] every statement, design and device which may mislead or deceive." *United States v. 95 Barrels–Cider Vinegar*, 265 U.S. 438, 442–43, 44 S.Ct. 529, 531, 68 L.Ed. 1094 (1924). The facts fail to support Efamol's argument that labeling the bulk EPO as "Pure Vegetable Oil" was not misbranding within the meaning of section 343.

Efamol sold the oil using the name "evening primrose oil," and Efamol's documents, advertising and expert witnesses all referred to the substance as "evening primrose oil." Thus, the record shows that the condemned substance was commonly sold and referred to as "evening primrose oil" or "oil of evening primrose" and not "pure vegetable oil."

In granting the government's motion for summary judgment, the district court also relied on the testimony of the government's expert witness, Dr. Kassarjian. Dr. Kassarjian testified that labeling the drums of oil as "PURE VEGETABLE OIL" implied that the oil was for cooking or salads, and not part of a dietary supplement. Efamol's

expert, Dr. Ross, stated that labels were not misleading because it was extremely unlikely that a reasonable consumer who saw gelatin capsules, labeled or not, would assume the product was intended as a cooking or salad oil. Plainly, Dr. Ross based his opinion on the encapsulated version of EPO. Such testimony ignores the facts presented in this case. The government is alleging that the oil as seized was misbranded. It is undisputed that when the oil was seized, it was in its bulk form. Thus, Dr. Ross' testimony does not raise a genuine issue of material fact on the misbranding issue presented in this case and the district court properly disregarded his testimony.[2]

■ Efamol contends that even if EPO was misbranded, it is exempt from the labelling requirements under 21 C.F.R. section 101.100(d)(2). This regulation exempts manufacturers from labeling their products with the usual or common name when the food is being shipped to another area for processing, repackaging and labeling if a written agreement exists: (1) between the shipper and the establishment that covers the shipment; (2) is signed by both parties; (3) contains the post office address of both parties; and (4) sets our specifications that will ensure that food will not be adulterated or misbranded when the processing, labeling, or repacking is completed. *Id.* All four elements must be present and both parties must keep copies of the agreement and make it available for inspection by the FDA. The exemption cannot be claimed if the food will be adulterated after processing.

■ Efamol had no single, concise document satisfying the requirements of section 101.100. Instead, Efamol relies on a collection of several letters and facsimile transmissions, arguing that when read together, an agreement was formed which conformed with the labeling exemption. We disagree. A simple reading of the documents demonstrates that each party had

---

**2.** We also consider the extent to which the label fails to reveal facts material in light of Efamol's representations. 21 U.S.C. § 321(n). Consequently we find it important that the FDA had issued an import alert for EPO. The FDA cannot accurately track EPO labelled as "pure vegetable oil."

unresolved questions on the vitamin E content of the capsules, the use of preservatives, packaging requirements, the appearance of EPO, Efamol's order number, and "micro testing."

The Food, Drug, and Cosmetic Act is a remedial measure. *United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 136–37, 88 L.Ed. 48 (1943). Misbranding was one of the chief evils Congress sought to stop when it enacted this legislation. *62 Cases of Jam v. United States*, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951). Given Congress' concern for proper labeling, we cannot find that the documents constitute an agreement. Rather than indicating an express intent to package the EPO capsules in a particular manner and ensure their purity, the documents reveal nothing more than a series of negotiations between Efamol and Banner for the encapsulation of EPO. Nowhere do the documents reflect a clear agreement that satisfies the four requirements of 21 C.F.R. section 101.100(d)(2).

■ Efamol has the burden of proving that the seized EPO was exempt from the labeling requirements under the Food, Drug and Cosmetic Act. *United States v. Article of Device * * * Toftness*, 731 F.2d 1253, 1262 (7th Cir.), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984). Because the communications submitted by Efamol fail to make a showing sufficient to establish the existence of an agreement under 21 C.F.R. section 101.100(d)(2), summary judgment was appropriate, *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### III.

■ Under the Food, Drug, and Cosmetic Act, a substance is a "food additive" when (1) it is intended for use as a component of a food; and (2) it is not generally recognized by qualified experts as safe under the conditions of its intended use. 21 U.S.C. § 321(s). "[A] food additive is presumed to be unsafe unless the Secretary of Health and Human Services has promulgated a regulation 'prescribing the conditions under which such additive may be safely used' or providing for 'investigational use by qualified experts.'" *United States v. An Article of Food*, 678 F.2d 735, 737 (7th Cir.1982) (quoting 21 U.S.C. § 348(a) and (i)).

■ No such regulatory approval exists for EPO. Rather, Efamol contends that the sale of EPO is lawful because EPO is not a "food additive" at all, as defined by the FDA, and hence needs no regulatory approval. In particular, Efamol argues that EPO is generally recognized as safe, and hence does not fit the regulatory definition of "food additive." "The burden of proving general recognition of safe use is placed on the proponent of the food substance in question." *United States v. An Article of Food*, 752 F.2d 11, 15 (1st Cir. 1985) (citing 21 U.S.C. § 348(a) and (i)).

To prove that EPO is generally recognized as safe, Efamol must (1) submit evidence establishing that scientifically trained experts qualified to evaluate EPO believe EPO is generally recognized as safe and (2) show that there is scientific data establishing the safety of EPO for use as a food supplement. *Cf. Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1973).[3]

■ Scientific studies which would support a finding that EPO is generally recognized as safe must be based on human, animal, analytical and other scientific studies. 21 C.F.R. § 170.3(h). This data must

---

**3.** Subsequent to oral argument, Efamol submitted a "motion to vacate and remand for further proceedings" based on new precedent. Efamol's motion is denied. First, the opinion cited by Efamol, *United States v. Two Plastic Drums ... of an Article of Food ... Blackcurrant Oil*, 761 F.Supp. 70 (C.D.Ill.1991) (hereinafter *BCO*), is from a district court and, therefore, is not binding precedent on this court. Second, the facts of *BCO* are distinguishable.

In *BCO* the government seized two drums of bulk black currant oil. The district court found that other than a preservative, black currant oil was generally the sole ingredient of the capsule. Consequently, the court held that a single ingredient cannot be a food additive. In the present case, however, the evidence has shown that EPO is mixed with Vitamin E when encapsulated. Therefore, EPO is not a single ingredient and is properly considered a food additive.

be collected and analyzed with regard to EPO's use as a dietary supplement. Furthermore, the information must be generally available to the community of experts and subjected to peer evaluation, criticism and review appropriate to establish such safety. 21 C.F.R. § 170.30(b); *Bentex Pharmaceuticals*, 412 U.S. at 652, 93 S.Ct. at 2493.

The evidence submitted by Efamol or used by Efamol's experts to evaluate EPO fails to meet the above criteria. Some of the data considered by Efamol's experts concerns EPO's use as a drug and not as a dietary supplement. Other data was based on unpublished materials, which were not subjected to peer evaluation. Thus, the opinions of Efamol's experts were contaminated by their consideration of unsuitable evidence.[4] *Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128, 1130 (9th Cir.1991); *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir.1991) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1991). In comparison, the government's witnesses testified that there is insufficient published scientific literature showing that EPO is safe and there is insufficient animal or human testing of EPO's use as a dietary supplement.

Thus, summary judgment was appropriate because Efamol failed to make a showing sufficient to establish the existence of an element essential to its case, and on which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *United States v. Articles of Food and Drug ...*, 518 F.2d 743, 747 (5th Cir.1975) (no genuine issue of material fact on the issue of general recognition of safety where evidence considered by plaintiff's experts was inappropriate).

## IV.

We hold that the district court properly found that the labeling of bulk EPO as "PURE VEGETABLE OIL" is misbranding pursuant to 21 U.S.C. section 343. We also find that EPO is a "food additive" within 21 U.S.C. section 321 and that Efamol has failed to show that EPO is generally recognized as safe; therefore, summary judgment was appropriate. Efamol's conduct comes four-square within the type of activity Congress sought to prohibit.

AFFIRMED.

---

4. During oral argument, Efamol conceded that in opposing the government's motion for summary judgment, (1) its experts relied on information never furnished to the government, despite the government's discovery request; and (2) it had not previously relied on this information to establish that EPO was generally recognized as safe. We make no findings on the proprietary of Efamol's actions. However, we do find, for the previously mentioned reasons, the additional data relied on by Efamol is insufficient under Rule 703 of the Federal Rules of Evidence.