UNITED STATES of America,
Plaintiff–Appellant,

v.

TWO PLASTIC DRUMS, MORE or LESS OF AN ARTICLE OF FOOD, LABELED IN PART: VIPONTE LTD. BLACK CURRANT OIL BATCH NO. BOOSF 039, etc., and Traco Labs, Incorporated, Defendants–Appellees.

No. 92–1172.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1992.

Decided Jan. 27, 1993.

Rehearing Denied March 31, 1993.

Douglas Letter, Robert D. Kamenshine (argued), Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, Leslie Kux, Food & Drug Admin., Rockville, MD, for plaintiff-appellant.

Robert Ullman (argued), Jacob Laufer, Steven Shapiro, Bass & Ullman, New York City, Marc Ansel, Erwin, Martinkus, Cole & Ansel, Champaign, IL, for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

The Food and Drug Administration ("FDA") brings this *in rem* seizure action under the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("Act"), seeking to condemn and destroy two drums of black currant oil as adulterated under 21 U.S.C. § 342(a)(2)(C) for being a food additive not recognized as safe. The district court granted summary judgment against the FDA, and the government appeals. We affirm.

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

## I.

Black currant oil ("BCO") is extracted from the seeds of the black currant berry and is marketed as a dietary supplement for its unique fatty-acid structures. The FDA argues that BCO is a food additive not generally recognized as safe ("GRAS") and seeks to seize and condemn two drums of BCO pursuant to sections 334 and 342 of the Act. A food is adulterated and subject to seizure under section 334 "if it is, or it bears or contains, any food additive which [the Secretary has not recognized as safe pursuant to section 348]." 21 U.S.C. § 342(a)(2)(C). The determination of whether a substance is a food additive is critical in establishing the safety of the substance because, if the substance is deemed a food additive, it is presumed to be unsafe, and the processor has the burden of showing that the substance is GRAS. On the other hand, if a substance is not a food additive, but food in the generic sense,[1] then the substance is presumed safe and the FDA has the burden of showing that the substance is injurious to health. *United States v. An Article of Food ... FoodScience Labs.*, 678 F.2d 735, 739 (7th Cir.1982).

The Act defines "food additive" as

any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures ... to be safe under the conditions of its intended use....

21 U.S.C. § 321(s). The FDA contends that BCO is a food additive because it is a "component" of food when it is combined with the gelatin and glycerin used to market the BCO in capsules. The gelatin and glycerin encase the BCO to prevent it from becoming rancid. The FDA concedes that if the BCO alone was marketed in bottles for teaspoon consumption, it would not be a food additive, and the FDA would bear the burden of proving that BCO is injurious to health. But the combination of BCO with glycerin and gelatin, the FDA maintains, creates a food consisting of three components, and thus, three food additives.[2] In this instance, therefore, the FDA would require the processor to prove that the substance is safe—something that Traco Labs, the claimant of the two drums of BCO, has not done.

The district court granted summary judgment against the FDA, holding that the FDA's definition of food additive "would obscure any distinction between 'foods' under § 321(f) and 'food additives' under § 321(s)" contrary to the intent of Congress. *United States v. Two Plastic Drums, More or Less of An Article of Food ... (Traco Labs)*, 791 F.Supp. 751, 754–55 (C.D.Ill.1991); *see also* 761 F.Supp. 70, 74 (C.D.Ill.1991) (order denying FDA's motion for summary judgment).

## II.

We review the grant of summary judgment de novo. *Overton v. Reilly*, 977 F.2d 1190, 1191 (7th Cir.1992). Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The sole issue presented in this action is whether BCO, when combined with glycerin and gelatin, is a food additive pursuant to section

---

1. Because food additives can be thought of as a subset of food in the broadest sense, *see Nutrilab, Inc. v. Schweiker*, 713 F.2d 335, 337 (7th Cir.1983), reference to food in the generic sense refers to articles of food not considered food additives.

2. Because gelatin and glycerin are GRAS, they are not formally considered "food additives" under the statute.

321(s). In determining what is a food additive, we look first to the language of the statute itself, *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), and if the language of the statute is plain, then it is conclusive absent contrary legislative intent. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Section 321(s) defines a food additive as "any substance the intended use of which results . . . in its becoming a component or otherwise affecting the characteristics of any food. . . ." This language is very broad, and thus, the general rule is that a component of an article of food is a food additive, even if the component in question is the "principal component," i.e. the ingredient sought when purchasing the food. *Food-Science*, 678 F.2d at 738. Moreover, even substances ordinarily considered "food" in common usage may become food additives in some circumstances. *National Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 391 (2d Cir.1978) (vitamins and minerals may be food additives when added to food). In addition, this court has held that DDT found naturally in fish is a food additive under the broad language of the Act. *United States v. Ewig Bros. Co.*, 502 F.2d 715, 721–24 (7th Cir.1974) (Stevens, J.), *cert. denied sub nom., Vita Food Prods. of Illinois, Inc. v. United States*, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423 (1975).

■ The FDA argues that the statutory language clearly indicates that any and every component of an article of food is a food additive. Although we are mindful of the deference due the FDA in construing the statute it administers, *Young v. Community Nutrition Inst.*, 476 U.S. 974, 981, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *United States v. 25 Cases, More or Less, of An Article of Device*, 942 F.2d 1179, 1182 (7th Cir.1991), deference here is unwarranted since its interpretation is contrary to the language and intent of the Act. *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (administrative interpretation of statute contrary to plain language is not entitled to deference). As an initial matter, we question whether BCO can even be considered a "component" under the Act. The term "component," commonly understood and defined as a "a constituent part" or "ingredient," Webster's Third New International Dictionary 466 (1976), loses its meaning when applied to foods used in conjunction with inactive ingredients, as this case amply evidences. Here, the dietary supplement (the food) is nothing but BCO combined with glycerin and gelatin—two inactive substances used for marketing the BCO in capsule form. The gelatin and glycerin do not interact with or change the character of the BCO, but merely act as a container comparable to a bottle containing liquids marketed for teaspoon consumption. The BCO in question is the dietary supplement and the dietary supplement is the BCO. Therefore, to hold that BCO is a component of the dietary supplement would be to find that BCO is a component of itself. Such an interpretation would defy logic and common sense.

■ But even assuming that a single active "ingredient" of food can be considered a component of the food, the statutory language does not indicate that every component of food is necessarily a food additive. The Act defines "food additive" as a substance "becoming a component *or otherwise affecting the characteristics of any food.*" 21 U.S.C. § 321(s) (emphasis added). The FDA interpretation of this provision implies that the language "or otherwise" is used disjunctively in such a way that a substance is a food additive if it (1) is a component of any food, *or* (2) affects the characteristics of a food. We think that this interpretation, however, distorts the plain meaning of the provision. The phrase "or otherwise," as employed here, is not used to express two alternative definitions of a food additive. Rather, it is used in a way to clarify or elaborate, such that "otherwise" is correctly read as "similarly." This view comports with established principles of statutory construction holding that courts should rein in broad and general statutory language when such language is

immediately coupled with more limiting language or a specific enumeration. 2A Norman J. Singer, Sutherland on Statutory Construction §§ 47.16, 47.17 (5th ed. 1992) (reviewing doctrines of *noscitur a sociis* (coupling of words denotes an intention that they be understood in same general sense) and *ejusdem generis* (general words coupled with statutory enumeration are construed only to embrace objects similar in nature)); *see also Toilet Goods Ass'n v. Gardner*, 278 F.Supp. 786, 790 (S.D.N.Y. 1968) (employing doctrine of *ejusdem generis* to limit expansive application of color additive provision), *aff'd in relevant part, rev'd in part sub nom., Toilet Goods Ass'n v. Finch*, 419 F.2d 21 (2d Cir.1969). The phrase "becoming a component" in section 321(s) is immediately followed by more descriptive language relating to the substance's effect on food. Moreover, the examples of food additives then enumerated in the Act describe the substances by their function or by their effect on food. 21 U.S.C. § 321(s) (listing as examples of food additives "any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting or holding food; and including any source of radiation intended for any such use"); *cf.* 104 Cong.Rec. 17,417 (remarks of Rep. Williams) ("substances which are used to improve the characteristics of our food are illustrative of the kinds of things this legislation deals with."); Harry A. Toulmin, Jr., Treatise on the Law of Foods, Drugs and Cosmetics §§ 22.5–22.10 (2d ed. 1963) (grouping food additives according to function). Therefore, simply becoming a "component" of food does not, in and of itself, satisfy the definition of a food additive. To be a food additive, a substance must not only be added to food, but it must also have the purpose or effect of altering a food's characteristics.[3]

■ When two or more active ingredients comprise a food, each component is arguably different from the food in such a way that the addition of each has affected the characteristics of the other components and of the food. Thus, courts faced with foods involving two or more active components have held that each component is a food additive. *See United States v. 45/194 Kg. Drums of Pure Vegetable Oil*, 961 F.2d 808, 812 & n. 3 (9th Cir.) (Evening Primrose Oil ("EPO") held food additive when encapsuled with Vitamin E, since "EPO is not a single ingredient"—distinguishing the case of BCO encapsuled alone), *cert. denied sub nom., Efamol, Ltd. v. United States*, —— U.S. ——, 113 S.Ct. 375, 121 L.Ed.2d 287 (1992); *FoodScience*, 678 F.2d at 738 (principal ingredient of food a food additive if combined with another active ingredient); *United States v. 41 Cases, More or Less, etc.*, 420 F.2d 1126, 1130 (5th Cir.1970) (medicated poultry feed found adulterated as containing two-three active ingredients held to be food additives); *United States v. 42/30 Tablet Bottles*, 779 F.Supp. 253 (E.D.N.Y.1991) (two active non-chemical ingredients of dietary supplement held food additives); *United States v. 21 Approximately 180 Kg. Bulk Metal Drums*, 761 F.Supp. 180 (D.Me.1991) (BCO held food additive when encapsuled with fish oil and various vitamins and minerals). But when there is only one active component, as is the case here, that single component does not affect the characteristics of the food in question—rather, it constitutes the food. Thus, even if we were to find that BCO was a component of the BCO dietary supplement capsules, the language of the Act indicates that it is not a food additive because, as the single active ingredient, it does not affect the characteristics of any food.

This interpretation is buttressed by the structure and history of the Act. The language of the Act must be read in the light of the statute as a whole: its design, objectives and policy. *Crandon v. United States*, 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *Illinois EPA v. United States EPA*, 947 F.2d 283 (7th Cir.1991).

---

3. Although certainly not controlling, our interpretation also reflects the common understanding of an additive, defined by Webster as "a substance added to another in relatively small amounts to impart or improve desirable properties or suppress undesirable properties." Webster's, *supra*, at 24.

Upon reviewing the structure and evolution of food regulation under the Act, it is clear that Congress intended to distinguish food additives from food in the generic sense. The original Food and Drug Act of 1906 required the government to prove that foods containing poisonous substances were unsafe. The addition of deleterious substances alone would not necessitate a finding of adulteration. *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). The Act was revamped in 1938, adopting a "per se" approach: It prohibited the use of poisonous or deleterious substances unless the industry proved that the addition of the substances was safe. *See Ewig Bros.*, 502 F.2d at 720; Toulmin, *supra*, §§ 1.5, 2.1, 2.3. The 1938 Act itself proved inefficient and Congress took steps to amend the Act in the early 1950's. Congress perceived essentially two flaws in the regulatory scheme. First, the government had the burden of first proving that a food additive is poisonous or deleterious before it could prevent the industry from using it. This required substantial time, during which the industry could market the potentially injurious additives to the consuming public. The second problem was that the law prevented processors from using certain additives in harmless amounts that, if used, would increase and improve the food supply. S.Rep. No. 2422, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 U.S.C.C.A.N. 5300, 5301; Toulmin, *supra*, § 22.3.

After six years of extensive hearings, Congress passed the Food Additives Amendment Act of 1958. The thrust of the amendments was to put upon processors rather than the government the burden of proving that a newly discovered substance added to food is safe if used within specified quantities. The Act, however, did not require processors to prove that all of their marketed food was safe, although Congress would have been free to enact such a requirement. Rather, the burden imposed upon processors applied only to food additives, and the government retained—as was the case prior to the 1958 amendment—the burden of proving that a given food was unsafe.

■ Consequently, the Act distinguishes between food additives and food in the generic sense, and this distinction is critical in allocating the burden of proof. The FDA's food additive definition is so broad, however, that it would blur this distinction. It would classify every component of food—even single active ingredients—as food additives. Thus, it would seem, even the addition of water to food would make the food a food additive. The only justification for this Alice-in-Wonderland approach is to allow the FDA to make an end-run around the statutory scheme and shift to the processors the burden of proving the safety of a substance in all circumstances. To be sure, the paramount objective of the Act is to protect the public health. But "[i]n our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop." *62 Cases of Jam v. United States*, 340 U.S. 593, 600, 71 S.Ct. 515, 520, 95 L.Ed. 566 (1951).

■ The FDA's interpretation would also arbitrarily classify a substance as either food or food additive by how it is marketed rather than by the nature and use of the substance itself. The FDA concedes that BCO marketed in bottles instead of in capsule form is not a food additive, and that it would in that event have the burden of proving that the BCO is harmful or deleterious. Yet there is no difference between the BCO bottled for teaspoon consumption and the encapsuled BCO but for the way it is marketed. How a product is marketed is not a rational way of determining whether a substance is a food additive and which party—the FDA or the processor—bears the burden of proving its effect, if any, on the consuming public.

Therefore, although a component of food is generally a food additive, when the "component" is the single active ingredient and thus in all material respects is identical to the food of which it is supposedly a component but for certain inactive additions, such as the gelatin and glycerin used for encapsulation here, the substance in

question is not a food additive. Our holding today is not inconsistent with *FoodScience*, the case on which the FDA relies. In that case, this Court held that the substance N,N-dimethylglycine hydrochloride ("DMG")—the lesser by weight and volume of two active components of the tablet Aangamik 15—was a food additive even though DMG was the "principal ingredient" of the tablets. 678 F.2d at 738. The DMG, even though it was the reason consumers would purchase Aangamik 15, comprised only 4 percent of the tablets' weight, and was mixed with another active ingredient (calcium gluconate) to form Aangamik 15. We did not reach the question presented here where the substance at issue is the single active ingredient of a marketed product. The district court in *FoodScience* enjoined the use of DMG "except when offered as a single ingredient for food use." But because the government did not cross-appeal from the exception, we refused to consider that question. *Id.* at 737 & n. 2. Indeed, if the majority opinion had held what the FDA alleges it held, the concurrence in that case, on which the district court below relied, would have been a dissent. The concurrence states:

> I believe ... as did the district court, that this would be a far different case if DMG were being marketed as a single food ingredient. In that case, the FDA would not be entitled to rely on the "food additive" presumption to condemn plaintiff's product but would instead be obligated to shoulder its normal burden of proving, by a preponderance of the evidence, that DMG was an "adulterated food" ....

*Id.* at 741 (Cudahy, J., concurring) (footnote omitted). In short, this case is different from *FoodScience* and other cases in which the substance in question was mixed with other active ingredients to form an arguably distinct article of food. *See 45/194 Kg. Drums of Pure Vegetable Oil,* 961 F.2d at 812 & n. 3; *41 Cases, More or Less,* 420 F.2d at 1130; *42/30 Tablet Bottles,* 779 F.Supp. at 253; *21 Approximately 180 Kg. Bulk Metal Drums,* 761 F.Supp. at 180. In fact, the rule enunciated today is supported by every court that has addressed the precise question involved here. *See United States v. 29 Cartons of An Article of Food ... Oakmont Inv. Co.,* 792 F.Supp. 139 (D.Mass.1992) (encapsuled BCO not food additive); *United States v. Vitality Systems, Inc.,* Food Drug Cosm.L.Rep. ¶ 38,-251 (D.Or. August 6, 1991) (holding that methylsulfonylmethane ("MSM") marketed in pure form not food additive but MSM held food additive in multi-ingredient products containing other nutrients such as Vitamin C); *United States v. Undetermined Quantities of Articles of Food ... Blue–Green Algae,* No. 83–1180–FR, 1984 WL 1981 (D.Or. November 8, 1984) (encapsuled Aphanizomenon flos-aquae (blue-green algae) not food additive because it was not intended to affect the characteristics of another food or become component of another food); *United States v. An Article of Food ... L–Tryptophan,* No. 77–687 (D.N.J. January 23, 1979) (L–Tryptophan tablets not food additive).

### III.

Accordingly, we hold that BCO encapsuled with glycerin and gelatin is not a food additive. Because the FDA has not shown that BCO is adulterated or unsafe in any way, there is no basis to condemn the two drums at issue. If BCO is injurious to health, the statute requires the FDA to prove as much. Meanwhile, the Act's labeling requirements protect the consuming public to the extent mandated by Congress by enabling persons to weigh for themselves the benefits and risks of consuming BCO. The judgment of the district court is therefore

AFFIRMED.